# IN THE SUPREME COURT OF IOWA

No. 15–0772

Filed June 22, 2018

**ROBERT KROGMANN,**

Appellant,

vs.

**STATE OF IOWA,**

Appellee.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Delaware County, Thomas A. Bitter, Judge.

A petitioner seeks further review of the court of appeals' decision affirming the denial of his application for postconviction relief based on the ineffective assistance of his criminal trial counsel. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED WITH INSTRUCTIONS.**

Angela L. Campbell of Dickey & Campbell Law Firm, PLC, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Martha A. Trout and Robert H. Sand, Assistant Attorneys General, and John Bernau, County Attorney, for appellee.

**APPEL, Justice.**

In this case, we consider whether Robert Krogmann, a severely mentally ill defendant charged with attempted murder and willful injury causing serious injury in connection with an attack on his former girlfriend, is entitled to a new trial after the State limited his access to his personal funds by freezing his assets prior to trial. Krogmann claims the order freezing his assets was illegal and imposed for an improper purpose. He also contends the asset freeze adversely impacted his ability to defend himself by, among other things, preventing him from posting bond, inhibiting his ability to select his counsel of choice, limiting the number of phone calls he could afford to make from jail, and preventing him from hiring a jury consultant to assist his defense. The State asserts Krogmann had sufficient access to resources to pay for competent defense counsel through a court-approval process. The State further contends Krogmann can make no showing of prejudice.

Krogmann filed an application for interlocutory appeal of the freeze order, which we denied. A jury was subsequently convicted Krogmann of attempted murder and willful injury causing serious injury. We affirmed his conviction on appeal. *State v. Krogmann* (*Krogmann I*), 804 N.W.2d 518, 520 (Iowa 2011). On direct appeal, we declined to address Krogmann's claims regarding the legality of the freeze order as they were not preserved. *Id.* at 523–25. His postconviction-relief (PCR) application and this appeal therefrom followed. For the reasons expressed below, we affirm in part and vacate in part the decision of the court of appeals, reverse the district court's judgment, and remand with instructions to vacate Krogmann's convictions and order a new trial.

## I. Background Facts and Proceedings.

**A. Introduction.** On March 13, 2009, Krogmann shot his former girlfriend, Jean Smith, after Smith ended their relationship. The attack was brutal. Krogmann, armed with a pistol, entered Smith's home to talk to her about their relationship. After some discussion, Krogmann shot Smith three times, pausing after each shot. He refused to call 911 at the time of the shooting despite pleas from Smith. Krogmann allowed Smith to speak to her mother on the phone, which instigated a chain of events leading to police and paramedics arriving at Smith's residence.

Krogmann was quickly apprehended and charged with attempted murder in violation of Iowa Code section 707.11 (2009) and willful injury causing serious injury in violation of Iowa Code section 708.4(1). Bond was initially set at $750,000 cash only. Smith survived the attack but endured extensive hospitalization, a long period of rehabilitation, and permanent injuries.

**B. Order Freezing Assets.** On March 24, 2009, the Delaware County Attorney, John Bernau, filed an application for an order freezing all of Krogmann's assets on behalf of the State. At the time, Krogmann had more than $3,000,000 in assets, most of which was farmland. The one-page application stated in its entirety,

> COMES NOW Delaware County Attorney, John W. Bernau, and in support of the State's Application for Order states:
>
> 1. On March 23, 2009, the undersigned filed a Trial Information in the above-captioned matter charging the Defendant Robert Krogmann with the offenses of Attempted Murder and Willful Injury.
>
> 2. The victim of the Defendant's offenses, Jean Smith, has suffered severe life altering injuries that will require approximately six to eight weeks initial hospitalization with unknown amounts of after care and treatment.

> 3. The victim's expenses associated with her hospitalization and after care are, and will be, sizeable.
>
> 4. The Defendant, if convicted, will be required to reimburse the victim for all out of pocket expenses associated with her hospitalization and after care as part of court-ordered restitution. Additionally, it is likely that the Defendant will be subject to civil litigation regardless [of] what happens in his criminal matter.
>
> 5. It is believed that the Defendant has a number of assets that he may attempt to sell or transfer to avoid his financial obligations to the victim of his offenses. It is therefore appropriate and necessary that the Court enter an Order freezing all of Defendant's assets which he owns personally or jointly with others unless application is made to the Court and good cause shown why the subject asset should be sold or transferred prior to criminal and/or civil restitution being established.
>
> WHEREFORE, the State of Iowa prays that the Court will enter an Order freezing all of Defendant's assets unless and until such time as Defendant makes application to the Court for the sale or transfer of an asset and is able to establish good cause why the asset should be transferred or sold prior to the establishment of criminal and/or civil restitution.

Notably, the application did not cite any authority for the total asset freeze or include any factual basis to support the assertion that Krogmann "may attempt to sell or transfer [his assets] to avoid his financial obligations."

The application contained a certificate of service stating it had been served on David Nadler, Krogmann's attorney of record at the time, by first-class mail on March 24, 2009, but the address listed on the application for Nadler is crossed out with an "X." Underneath the crossed out certificate of service is a notation stating, "Re-mailed on 3-30-09."

On March 30, the date the application was remailed to Nadler, the district court, without a hearing, entered an order granting the asset

freeze and requiring Krogmann to make an application to the court prior to sale or transfer of any asset. The order provided,

> The State's Application for Order filed March 24, 2009, is granted. All of the Defendant's assets shall be frozen. The Defendant shall make application to the Court for the sale or transfer of an asset at which time the Court will determine whether good cause has been shown to grant the application.

Like the asset-freeze application, the order granting the freeze did not cite any authority or legal basis for the asset freeze.

Nadler received the order granting the asset freeze before he saw the application requesting it. Although the court had already entered the order, Nadler filed a resistance to the asset-freeze application on April 2, arguing "the State has cited no authority for [the asset freeze] nor does any exist." On April 28, Nadler filed an application for interlocutory relief, which we denied on May 26.

While Krogmann's application for interlocutory appeal was pending, he filed a motion to reduce the $750,000 bond amount. Following our denial of interlocutory relief and after holding a hearing, the district court raised the bond amount to $1,000,000 cash only on June 1.

Due to being incarcerated and the asset freeze, Krogmann voluntarily applied for the appointment of a conservator to manage his assets. On April 13, the probate court approved the application, declaring Krogmann "is incapacitated and will be unable to carry on his business and make decisions and transactions for the foreseeable future." The probate court directed the appointed conservator to adhere to the asset-freeze order entered in Krogmann's criminal case "and make application to the Court for authority to sell or transfer any assets other

than in the normal course of the farming operation where the transfer is made for good and valuable consideration."

**C. Applications Submitted to the Probate Court Pursuant to Freeze Order.** Pursuant to the freeze order, Krogmann, through his conservator, applied to the probate court to expend his assets. The county attorney and the victim were able to review each application and allowed to, and did, object to Krogmann's requests to use his own assets.

On June 15, Krogmann's conservator applied to the probate court to mortgage farmland to raise the funds necessary to post bond. The victim, citing her high past and future medical expenses, resisted the application, which the probate court denied on June 20.

On September 3, Krogmann's conservator applied to the probate court to obtain funds of $500 per month for jail amenities, toiletries, and phone cards to make phone calls from jail. The State, asserting the request was "unreasonable and excessive," resisted the application, which the probate court denied on September 21.

On several occasions, Krogmann's conservator applied to the probate court for payment of attorney fees in connection with the criminal proceeding. Although payment was sometimes delayed,[1] the probate court approved use of Krogmann's assets to pay for his criminal defense attorneys and some defense expenses.[2]

On October 16, Krogmann's conservator, pursuant to Krogmann's criminal defense attorney's[3] request for an additional $12,000—$4000 to

---

[1]Krogmann's August 3, 2009 request for $20,000 to pay counsel was not granted until September 17, 2009.

[2]For example, the probate court approved reimbursing Krogmann's son $393.84 for clothing purchased for Krogmann to wear at trial.

[3]By that time, Krogmann had retained attorney Mark Brown as criminal defense counsel. Nadler, Krogmann's initial criminal defense counsel, withdrew on June 22.

$8000 of which was earmarked for a jury consultant—asked the probate court whether it was necessary to file another application for additional funds or if the court could authorize the additional $12,000 without another application.[4]  In an order entered on October 20, the probate court found "the request [for additional funds] is appropriate in light of the delineated necessities."  However, because the request was not submitted as a motion "and other individuals have previously objected to disbursements from this conservatorship," the court postponed authorizing the funds until the conservator provided notice of the intended disbursement "to all interested parties" and the court received any timely objections.  The State objected to funds for a jury consultant, arguing a jury consultant "is considered a luxury rather than a necessity."  On October 30, the probate court denied the request for funds for a jury consultant.

**D.  Trial Proceedings.**  The case came to jury trial on November 2, 2009.

1. *Opening statements.*  In opening statements, the State[5] emphasized the simple facts of the case: Krogmann went to Smith's residence, gained entry, and shot her three times, once in the stomach, once in the arm, and once in the spine.  The prosecution described phone calls made by Smith to her mother and by Krogmann to his son after the shooting.  The prosecution described in detail the crime scene, the arrival by police, and Krogmann's subsequent arrest.

---

[4]Krogmann's conservator had previously filed a request for additional funds for attorney fees and criminal defense expenses, which the probate court granted on September 18.

[5]At trial, Assistant Attorney General James Kivi conducted the State's prosecution, including presenting opening and closing statements and conducting all direct and cross-examination.  Upon County Attorney Bernau's request, Kivi was brought in to help with the case.

The defense in its opening did not dispute that Krogmann shot Smith three times. The defense urged the jury to consider that Krogmann had a documented fifteen- or twenty-year history of "bipolar [disorder] with depression" and had been "hospitalized for suicide thoughts, depression, sleep disorders, [and] a host of other issues." The defense noted Krogmann had no criminal history to speak of yet ended up shooting his former girlfriend.

The defense urged the jury to consider closely the testimony of defense expert, psychiatrist Dr. James Gallagher. The defense asserted Dr. Gallagher would opine there was a possibility that on March 13, Krogmann's medical condition came into play and "could skew what we call intent." The defense told the jury that testimony from the Krogmann family members would establish a history of mental illness and odd behavior regarding Smith—such as texting her fifty or sixty times a day, making unwelcome appearances at her home, sending her flowers at her employer's place of business after she refused to see him—shortly before the tragic events of March 13. The defense told the jury it would receive evidence that after March 13, Krogmann had attempted suicide by wrapping a phone cord around his neck and by cutting his wrist with a plastic fork, which required a trip to the hospital for stitches.

2. *Evidence presented at trial.* The State established its case through testimony from Smith, her brother, Krogmann's son (who arrived at the scene shortly after the shooting), Smith's mother (who received a phone call from her daughter after the shooting while Krogmann was still at the residence), and various law enforcement and emergency medical personnel. These witnesses testified regarding the facts of the shooting and the crime scene. For the most part, cross-examination by the defense focused on witness knowledge of Krogmann's mental health.

The defense called Krogmann's mother, a brother, a daughter, and a sister-in-law as witnesses. These witnesses had no direct knowledge of the events of March 13, but they did present evidence on Krogmann's mental health. Krogmann's sister-in-law testified that after the breakup with Smith, Krogmann seemed fixated on Smith, would stare at the wall blankly, and repeat the same thing over and over again. She further testified that the family threatened Krogmann with commitment but did not follow through. Other family members recounted Krogmann being hospitalized for mental health issues in the past. The family members testified Krogmann was very distraught over the breakup with Smith and they had told him the relationship with Smith was over but that was something Krogmann could not accept.

After his family members testified, Krogmann took the stand in his own defense. Krogmann testified he had had mental health issues since his twenties or thirties. He described a history of being seen by local psychiatrists, receiving prescriptions for antidepressants, hospitalizations for mental health issues, and occasional suicide ideation.

Krogmann admitted going to Smith's house on March 13 with a pistol. He could not explain the purpose of carrying the pistol other than he was depressed and suicidal. He denied both intending to harm Smith and remembering the sound of the gun. He testified he merely remembered seeing Smith laying on the floor and bleeding.

On cross-examination, the prosecutor began by briefly asking Krogmann if he was suffering from bipolar disorder on March 13 and if he was currently suffering from that disorder. Krogmann responded affirmatively. The prosecutor then asked, "Shot anybody today?"; the immediate objection to which was sustained.

The defense's final witness and only expert was Dr. Gallagher. Dr. Gallagher testified,

> [O]ne of the characteristics of being in the severe depressed phase or a manic phase of bipolar disorder is that you lack insight into the fate of your illness so you don't know what you're doing and you don't know what you're doing is incorrect or not functional.

According to Dr. Gallagher, bipolar disorder can influence a person's intent. Dr. Gallagher testified "it's possible" that either Krogmann's bipolar condition or his depression could have influenced his intent on March 13.

On cross-examination, Dr. Gallagher conceded he could not say with medical certainty that Krogmann's intent was affected by his bipolar condition. Dr. Gallagher further agreed he had no reason to believe Krogmann did not know the difference between right and wrong. Dr. Gallagher averred he did not have an opinion regarding whether Krogmann had the mental capacity to form specific intent on March 13.

The State called psychiatrist Dr. Michael Taylor as a rebuttal witness. Dr. Taylor agreed with Dr. Gallagher that Krogmann suffered from bipolar disorder. Like Dr. Gallagher, Dr. Taylor testified that on March 13, Krogmann was capable of distinguishing right from wrong. Further, Dr. Taylor attested Krogmann, by his own admission, was fully capable of forming specific intent. Dr. Taylor noted that on the morning of the shooting, Krogmann conducted business, returned to his house to gather his gun, and intended to shoot himself. Dr. Taylor also cited Krogmann's post-shooting action of getting Smith a rosary as demonstrating specific intent. Dr. Taylor conceded, however, it is theoretically possible for bipolar disorder or depression to influence a person's intent.

3. *Jury instructions.* After the close of testimony, the court considered the State's objection to submitting a jury instruction on diminished responsibility. The district court overruled the objection, noting Dr. Gallagher's testimony that it was possible Krogmann's depression or bipolar disorder could have influenced his intent and other testimony for the defense supported the theory.

The specific intent and diminished responsibility jury instructions submitted by the court were Instructions No. 24 and No. 25. Instruction No. 24, the specific intent instruction, provided,

> "Specific intent" means not only being aware of doing an act and doing it voluntarily, but in addition, doing it with a specific purpose in mind.
>
> Because determining the defendant's specific intent requires you to decide what he was thinking when an act was done, it is seldom capable of direct proof. Therefore, you should consider the facts and circumstances surrounding the act to determine the defendant's specific intent. You may, but are not required to, conclude a person intends the natural results of his acts.

Instruction No. 25, the diminished responsibility instruction, stated,

> One of the elements the State must prove is that the defendant acted with specific intent. The lack of mental capacity to form a specific intent is known as "diminished responsibility."
>
> Evidence of "diminished responsibility" is permitted only as it bears on his capacity to form specific intent.
>
> "Diminished responsibility" does not mean the defendant was insane. A person may be sane and still not have the mental capacity to form an intent because of a mental disease or disorder.
>
> The defendant does not have to prove "diminished responsibility"; rather, the burden is on the State to prove the defendant was able to, and did, form the specific intent required.

4. *Closing arguments.* The State's closing argument began with a brief summary of the events of March 13 and the elements of attempted murder. The State then focused, however, on the related questions of specific intent and diminished responsibility. The State closed by reviewing the elements of willful injury.

The defense's closing argument concentrated on Krogmann's mental health. The defense noted Krogmann came to the case with fifteen or twenty years of mental health issues. The defense recounted the testimony of family members about Krogmann's mental health.

5. *Jury verdict, sentence, and award of restitution.* After deliberating for a couple of hours, on November 6, the jury found Krogmann guilty of attempted murder and willful injury causing serious injury. For the attempted murder conviction, the district court sentenced him to an indeterminate term of twenty-five years in prison with a mandatory minimum of 17.5 years before being parole or work release eligible. For the willful injury conviction, the court sentenced him to an indeterminate term of ten years and applied Iowa Code section 902.7's dangerous-weapon enhancement to impose a mandatory minimum of five years. The court ordered the sentences to run consecutively. The court ordered Krogmann to pay $35,570.14 in victim restitution to Smith and $18,219.54 in restitution to the Delaware County Sheriff's Department and the State.

**E. Direct Appeal.** Krogmann appealed his convictions. *Krogmann I*, 804 N.W.2d at 520. On appeal, he challenged the constitutionality and legality of the asset-freeze order. *Id.* at 522. He further claimed the prosecutor engaged in misconduct when he asked Krogmann, "Shot anybody today?" *Id.*

With respect to his challenges to the asset freeze, we stated,

> We are troubled by the State's effort to tie up a criminal defendant's personal assets without citing any rule or statute, without making a verified filing, and without citing the district court to relevant authority ([*State ex rel. Pillers v.*] *Maniccia*[, 343 N.W.2d 834 (Iowa 1984)]). We are also troubled by the State's attempts to use the asset freeze, once it was in place, to object to defense expenditures not on the ground they would jeopardize restitution or other victim compensation (the alleged reasons for the asset freeze), but simply because the State deemed them unnecessary.

*Id.* at 525. Yet we declined to reach the issue's merits because Krogmann's trial counsel did not preserve the issue for appeal. *Id.* at 523–25. Trial counsel did not raise any constitutional challenges to the asset freeze before the district court. *Id.* at 523. Additionally, while Krogmann's trial counsel did contest the lack of authority for the freeze order after the court entered it, counsel never sought a hearing or dissolution of the order after it was entered. *Id.* at 523–24. In a footnote, we expressly noted the asset-freeze issue could be raised as an ineffective-assistance-of-counsel claim in a PCR proceeding. *Id.* at 525 n.8.

With respect to the claim of prosecutorial misconduct, we also concluded that claim was not properly preserved. *Id.* at 526. While we observed the "Shot anybody today?" question was "inflammatory and improper," we did not believe the "isolated incident of misconduct was so severe or pervasive that it affected Krogmann's right to a fair trial." *Id.* at 526–27.

**F. PCR Proceedings.**

1. *Overview of proceedings.* After obtaining no relief on direct appeal, Krogmann filed a PCR action on October 5, 2012. Krogmann claimed his defense counsel provided constitutionally ineffective assistance under the Sixth Amendment of the United States Constitution and article I, section 10 of the Iowa Constitution by failing to challenge

and preserve an objection to the freeze order; by failing to challenge as prosecutorial misconduct the prosecutor's asset-freeze application, "continued involvement in the handling of [Krogmann's] assets and presentation of his defense," and question of "Shot anybody today?"; in pursuing Krogmann's defense, specifically the defense of diminished responsibility; and by failing to object as a violation of double jeopardy and the merger doctrine the consecutive sentences for attempted murder and willful injury.

The PCR court held a hearing on the application on January 22, 2015. Krogmann offered his own testimony and the testimony of Marygrace Schaeffer, a jury and trial consultant. In addition, he offered as exhibits a report on jury consultant assistance (prepared by Schaeffer and a colleague from her consulting firm), the deposition testimony of County Attorney Bernau and Krogmann's two criminal trial lawyers, Nadler and Brown, and the psychiatric report and evaluation of Dr. Jerome Greenfield, among other things.

2. *PCR testimony of jury consultant Marygrace Schaeffer.* Schaeffer testified she is an expert jury consultant hired in a variety of matters. She asserted that if she had been present for jury selection, she would have made a number of suggestions or recommendations regarding the structure of jury selection. Further, Schaeffer was highly critical of the voir dire conducted by Krogmann's trial counsel in this case involving mental health and guns.

On the topic of the structure of jury selection, Schaeffer noted the trial court selected fifteen jurors without identifying which jurors were alternates. She testified she would have urged Krogmann's counsel to object to this procedure. According to Schaeffer, because of the lack of

identification of which juror were alternates, jury selection was harder for Krogmann and put the defense at a "great disadvantage."

Schaeffer was also highly critical of the approach of Krogmann's counsel to voir dire of the jury panel. She noted that during voir dire, Krogmann's counsel asked many closed-ended questions and did not give the potential jurors an opportunity to talk enough for effective jury selection. Schaeffer opined,

> [I]f you don't allow them to talk based on the fact that you're doing all the talking, then you're not learning what their potential preexisting beliefs, attitudes, biases are, and you can't make an informed decision on whether they are a dangerous juror or not for you and your client.

According to Schaeffer, without exception, you want the potential jurors to talk more than the lawyer during voir dire and this approach is supported by scientific research.

Additionally, Schaeffer noted, based on her review of the jury selection transcript, a lack of effective follow-up with potential jurors who were able to speak. She criticized Krogmann's counsel for asking jurors whether "you can be fair and put [misconceptions of the law] aside"—a technique Schaeffer would not recommend.

Schaeffer cited the fact that no potential juror was disqualified for cause as support for her conclusion about the ineffectiveness of the voir dire. She told the court it was "very unusual" or "very rare" for the defense not to have any for-cause strikes in a case of this magnitude. Schaeffer testified scientific research on criminal cases, as well as her work on Iowa cases, reveals jurors have "attitudes about mental health" and "gun use," which could support for-cause challenges. Schaeffer attested the lack of for-cause strikes during voir dire disadvantaged Krogmann.

Finally, Schaeffer testified "with reasonable certainty" that if a jury consultant had been involved in the jury selection, there would have been a different jury. Moreover, according to Schaeffer, if she had been involved in the jury selection, it would have been "highly likely" that a different jury would have been chosen.

A report prepared by Schaeffer and a colleague was admitted into evidence at the PCR hearing. Among other things, the report listed various cases where jury consultation was employed and summarized recent research findings. The report concluded,

> Without having access to professional assistance in developing and assessing profiles of favorable and unfavorable jurors prevalent in the venue, Mr. Krogmann was denied the ability to use such information as identified in the above research methodologies, to tailor voir dire efforts to more efficiently and effectively identify jurors with unfavorable characteristics and opinions, and prompt those prospective jurors to reveal their biases.

Further, the report stated, "[In f]ailing to identify and address such bias, Mr. Krogmann was additionally unable to benefit from expert consultation in evaluating and exercising strikes to strategically produce a jury composition more disposed to fairly evaluating the charges against him." The report concluded, "Prohibiting the defendant access to use and benefit from well-established and commonly employed social science jury selection and consulting assistance has significantly handicapped Mr. Krogmann's ability to defend himself in court."

3. *Krogmann's PCR testimony.* Krogmann testified the asset freeze affected the way he approached his defense—that it "disadvantaged every move, every thought or strategy." He told the PCR court that but for the asset freeze, he would have bonded out of jail. Once having bonded out, he would have sought the best possible defense team "probably" from across the nation, "no matter what it would have cost." Krogmann

testified that if he had bonded out, he would have hired additional lawyers "who [he] was confident with." He noted that in hiring PCR counsel, he had contacted more than "a dozen" attorneys to get additional names and addresses.

Krogmann testified regarding his mental health while in jail. He was not able to see his personal physician to manage his illness. Thus, when he was incarcerated awaiting trial, he had to take a "pretty high dose of something that was very mind-altering" prescribed by the state doctors. But then he was taken off that medication one week before his trial, which caused him to experience withdrawal symptoms during his criminal trial, including feeling as though "the floor was moving under [his] feet."

Krogmann testified that while in jail, he attempted to take steps to contact other attorneys. He recalled his unhappiness with Brown, desire to contact Des Moines attorneys, and request to a jailer for a Des Moines phone book, to which the jailer responded that no such phone book was available. He stated that he asked his family and friends to get him the phone number of a Des Moines attorney but that did not happen because they did not understand the gravity of his request.

Krogmann testified he could not buy phone cards to make calls from jail because of the asset freeze. He stated that, at times, he did not have the ability to make phone calls and he had to call his attorneys collect.

Krogmann told the court it was his idea to hire a jury consultant and he specifically asked Brown to do so. Krogmann acknowledged that he was paying for Schaeffer to provide evidence on his behalf at the PCR hearing. He asserted he would have engaged a jury consultant to do research on the potential jury pool and provide advice during the jury

selection process at his criminal trial if he had been able to access his assets.

Krogmann recognized his primary defense was diminished responsibility. He questioned the experience of the defense expert used at his criminal trial and asserted he would have hired multiple experts if he had been able to access his assets.

While in jail, Krogmann's communications were monitored and later used against him at sentencing. In those communications, he made inflammatory statements about, *inter alia*, the victim, the judicial system, jurors, and a Dubuque newspaper. If he had been out on bond, these materials would not have been available to the prosecution at sentencing.

4. *County Attorney Bernau's PCR testimony (by deposition).* Bernau testified he received advice from either the Iowa Attorney General's Office or the Iowa County Attorneys Association regarding the asset freeze. He thought he was sent a form to use in the case. Bernau told the court, at the time of Krogmann's prosecution, he was a part-time county attorney and did not do any research on the asset-freeze issue.

With respect to victim restitution, Bernau asserted Krogmann was responsible for "whatever might not be covered by insurance." Bernau acknowledged that at the time of the asset-freeze order, he knew there was some insurance coverage but he did not know the actual extent of the coverage. He further testified no one approached him regarding a potential cap on the asset freeze. He recalled a brief discussion with a judge about a potential hearing date on the issue but nothing substantive.

5. *Criminal defense counsel David Nadler's PCR testimony (by deposition).* Nadler testified he was outraged by the asset-freeze order

and he received the order before he had received the application for it. Nadler explained he did not consider requesting a hearing before the court on the asset-freeze order because he assumed it was entered by "a cowboy judge." He conceded he did not think about whether he had sufficiently preserved the issue for appeal.

On the question of potential release on bond, Nadler testified he did not know whether Krogmann's release would have helped or harmed the case. But he averred that he did not think the freeze order affected his representation of Krogmann.

6. *Criminal defense counsel Mark Brown's PCR testimony (by deposition).* Brown stated he was in solo practice, doing primarily criminal work in state and federal court. He testified Krogmann hired him around the time the interlocutory appeal was filed or pending (June 2009). According to Brown, Krogmann disclosed to him the need for court approval for payment of fees in light of the freeze order. Brown did not think the asset freeze adversely affected his ability to defend Krogmann. Although he was not a fan of the court-approval procedure for getting paid, the court-approval requirement "did not seem to affect what [he] was doing for [Krogmann]" except for hiring a jury consultant. As a general matter, Brown "never felt restricted or restrained from asking for funds for Robert's defense."

Brown admitted he never considered appealing the asset-freeze order or taking any further action in connection with it. His reason for that decision was the fact that Nadler had already applied for interlocutory appeal, which had been rejected.

Brown testified about his approach to the diminished responsibility defense. He thought Dr. Gallagher's opinion was appropriate even though it was equivocal on the key issue of specific intent, so he did not

consider seeking another expert opinion. Brown also concluded Krogmann's medical records, which indicated periods of stability intermingled with stopping and starting medications, would not be helpful to the defense.

On the issue of the jury consultant, Brown acknowledged that although he had used a jury consultant in only one case before Krogmann's, a jury consultant was "one of the tools that a defendant may use to assist the defense." While Brown was unsure whether a defendant had a right to spend his or her own money on a jury consultant, he stated, "I'm sure many defendants believe it is important to their defense."

On the 911-tape issue, Brown thought presenting to the jury the fact that Krogmann called 911 would undercut the diminished responsibility defense by showing Krogmann knew he had done something wrong. With respect to the "Shot anybody today?" question, Brown asserted it was a cheap shot that would likely backfire on the prosecution.

7. *Dr. Jerome Greenfield's report of his examination of Krogmann's mental health.* The PCR court received a report from a psychiatrist, Dr. Jerome Greenfield. Dr. Greenfield conducted a posttrial, independent examination of Krogmann and surveyed Krogmann's history, which included three psychiatric hospitalizations and bouts of significant and severe depression and manic episodes. Krogmann told Dr. Greenfield that he could not recollect many details of what happened at Smith's house on March 13—only that they were talking and then, the next thing was they were both lying on the floor.

Dr. Greenfield diagnosed Krogmann with bipolar affective disorder type I. He noted there were periods of time when Krogmann became

manic and did things of which he later had no recollection. Citing studies, Dr. Greenfield declared people with bipolar disorder can experience psychotic states and "it is very possible that this has happened from time to time with [Krogmann]." Dr. Greenfield concluded,

> It is my opinion that his severe and chronic mental illness did impact his actions at the time of the crime. There is a possibility that at the time of the crime he may have had a brief psychotic episode as well as being severely depressed.

8. *The PCR court's ruling.* On April 14, 2015, the PCR court denied Krogmann's application. With respect to the ineffective-assistance claim challenging the asset freeze, the court found defense counsel's failure to properly preserve the asset-freeze issue for appeal fell below the requisite standard of care. Nevertheless, the court concluded no prejudice could be traced to the asset-freeze order, finding Krogmann could not show prejudice from his inability to make bail, hire other attorneys, or obtain better or additional experts.

The court also rejected Krogmann's ineffective-assistance claims based on counsel's failure to raise issues of prosecutorial misconduct and to obtain the 911 tapes, noting the lack of prejudice. The court rejected Krogmann's argument that he is entitled to a new trial due to the prosecutor's isolated, improper "Shot anybody today?" question. Finally, the court rejected Krogmann's claim that his consecutive sentences for attempted murder and willful injury violated double jeopardy and the merger doctrine.

In its April 14 ruling, the PCR court did not address Krogmann's claims that he was prejudiced by his counsel's deficient performance because he was unable to hire a jury consultant and that the asset freeze constituted prosecutorial misconduct. On April 27, Krogmann filed a

motion to enlarge and amend, asking the PCR court to address those contentions.  The court did not respond, and Krogmann timely appealed.

**G. Appeal from the Denial of Postconviction Relief.** We transferred Krogmann's appeal to the court of appeals, which affirmed the PCR court's denial of relief.  Krogmann then applied for further review, which we granted.  On appeal, Krogmann first asserts his criminal defense counsel was ineffective in handling the asset freeze. Krogmann argues prejudice from his counsel's deficient performance should be presumed under the circumstances.  Alternatively, Krogmann maintains he has shown traditional prejudice arising from the asset freeze.  As a result, Krogmann asks us to vacate his convictions and remand his case for a new trial.

Aside from the asset-freeze issue, Krogmann alleges his attorney provided ineffective assistance in several respects.  He claims his counsel was ineffective in raising and presenting his mental health defense, failing to seek a mistrial after the prosecutor's "Shot anybody today?" question, failing to obtain phone records demonstrating Krogmann called 911 on the day of the shooting, and failing to obtain mental health records in support of his defense.

Krogmann additionally argues there was sufficiently pervasive prosecutorial misconduct to require a new trial.  Krogmann asserts the prosecutor committed misconduct by seeking and being continuously involved with the asset freeze, falsely telling the jury that Krogmann did not call 911 for help after shooting Smith, and inconsistently arguing Krogmann needed a conservatorship to control his assets while contesting Krogmann's diminished responsibility defense at trial.

Finally, Krogmann argues his consecutive sentences violated the merger doctrine and his constitutional right to be free from double

jeopardy. Krogmann argues the lesser crime of willful injury causing serious injury should merge with the greater crime of attempted murder.

## II. Standard of Review.

We normally review postconviction proceedings for correction of errors at law. Iowa R. App. P. 6.907; *Castro v. State,* 795 N.W.2d 789, 792 (Iowa 2011). However, a PCR application alleging ineffective assistance of counsel raises a constitutional claim, and "[w]e review postconviction proceedings that raise constitutional infirmities de novo." *Castro*, 795 N.W.2d at 792.

## III. Ineffective Assistance of Counsel and the Denial of Sixth Amendment and Article I, Section 10 Rights Caused by the Unlawful Asset Freeze.

**A. Introduction.** Krogmann's most powerful claim is that his lawyers provided ineffective assistance under the Iowa and United States Constitutions by failing to properly object to the court-ordered asset freeze.[6] "When evaluating ineffective-assistance claims, we apply a two-pronged test: we ask whether trial counsel breached an essential duty and whether prejudice resulted from any such breach." *State v. Gaskins*, 866 N.W.2d 1, 5 (Iowa 2015); *accord Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). To satisfy the breach prong, Krogmann must establish his counsel's performance fell "below the standard demanded of a reasonably competent attorney." *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001) (en banc) (citing *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064–65). We presume counsel acted competently, but that presumption is overcome "if we find [Krogmann]

---

[6]While Krogmann cites both the due process and right-to-counsel provisions of the Iowa and the United States Constitutions, he does not develop a different standard for ineffective assistance under the Iowa Constitution. We thus apply the prevailing federal standard, reserving, of course, the right to apply that standard in a fashion different from federal precedent. *See State v. Short*, 851 N.W.2d 474, 492 (Iowa 2014).

has proved his counsel's performance 'fell below the normal range of competency.' " *State v. Harris*, 891 N.W.2d 182, 186 (Iowa 2017) (quoting *State v. Horness*, 600 N.W.2d 294, 298 (Iowa 1999)). Failure to raise a meritless issue does not establish counsel's performance was deficient. *Id.* If Krogmann has established his counsel breached an essential duty, we then address whether he has satisfied the prejudice prong.

Consequently, in order to resolve this issue, we first consider whether the asset freeze was unlawful, a notion suggested but not actually decided on Krogmann's direct appeal. *See Krogmann I*, 804 N.W.2d at 525. If we determine the asset freeze was unlawful, we next consider whether counsel breached an essential duty in failing to properly challenge the asset freeze. Finally, if we determine counsel breached an essential duty, we consider whether Krogmann is entitled to relief without a showing of prejudice or whether Krogmann must show prejudice under the standards enunciated in *Strickland*.

**B. Lawfulness of the Asset Freeze.** Krogmann maintains the asset freeze was clearly illegal under our prevailing precedent. In support of his position, he cites *Maniccia*. In *Maniccia*, we considered whether "persons charged with crime [can] be enjoined from disposing of property which might otherwise be used to reimburse their alleged victims or the county." 343 N.W.2d at 834. The state argued the defendants could be enjoined from disposing of their property until the court determined whether the defendants owed restitution to the alleged victim or the county under the restitution provisions of Iowa Code chapter 910 (1983). *Id.* at 835. We held the court had no power to issue such an injunction. *Id.* Among other things, we noted the assets the

state sought to freeze "might lawfully belong to the defendants" and "might be needed to finance their defense." *Id.* at 836.

Krogmann further argues the injunctive provisions of the Iowa Rules of Civil Procedure do not apply in this case. Krogmann notes that in order for the civil rules to apply in criminal matters, there must be specific statutory authorization, which, Krogmann points out, does not exist. *See State v. Wise*, 697 N.W.2d 489, 492 (Iowa Ct. App. 2005) ("The Rules of Civil Procedure have no applicability in criminal cases, unless made applicable by statute." (citing *State v. Dist. Ct. of Iowa ex rel. Delaware County*, 253 Iowa 903, 905, 114 N.W.2d 317, 318 (1962), *overruled on other grounds by State v. Peterson*, 219 N.W.2d 665, 669 (Iowa 1974) (en banc), *superseded by* Iowa R. Crim. P. 2.13(1), *as recognized in State v. Folkerts*, 703 N.W.2d 761, 764 (Iowa 2005))). Further, even if they did apply, the civil rules related to injunctions have a number of important requirements, including an affidavit in support of the injunction, a showing that the person subject to the injunction is doing things or allowing things to be done that would render a judgment ineffectual, a certification whether the relief sought has previously been presented to any other court or justice, and the posting of bond in the amount of 125% of the probable liability. *See, e.g.*, Iowa Rs. Civ. P. 1.1502, 1.1504, 1.1508.

Finally, Krogmann notes Iowa Code section 910.10 provides for a restitution lien. *See* Iowa Code § 910.10(1) (2009). But restitution awards are set off by insurance. *See id.* § 910.1(3) (defining "pecuniary damages" as "all damages to the extent not paid by an insurer"); *id.* § 910.1(4) (defining "restitution" to include "payment of pecuniary damages to a victim"). Further, under section 910.10, the party seeking

the restitution lien must state "[t]he amount of restitution the person has been ordered to pay or is likely to be ordered to pay." *Id.* § 910.10(2)(*g*).

In response, the State does not defend the asset-freeze order on its merits. The State's brief does not cite *Maniccia,* the civil procedure rules related to injunctions, or Iowa Code section 910.10. In effect, the State has abandoned the notion that the asset freeze was lawfully imposed.

In any event, we think *Maniccia* is determinative on the question of whether the State may seek a common law remedy of an injunction prohibiting a defendant from disposing of assets. Further, the asset-freeze application here did not remotely resemble an application for an injunction under the rules of civil procedure, *see, e.g.,* Iowa Rs. Civ. P. 1.1502, 1.1504, 1.1508, nor did it comply with the requisites of Iowa Code section 910.10, *see* Iowa Code § 910.10(2). Simply put, the asset freeze in this case was unlawful under Iowa law regardless of any Sixth Amendment or article I, section 10 right Krogmann might have to spend his money on his criminal defense.

**C. Defense Counsel's Breach of an Essential Duty.** Krogmann argues his lawyers breached a duty owed to him by failing to appropriately challenge the asset freeze in the district court. Krogmann notes the asset-freeze order in his case was precisely the kind of order prohibited in *Maniccia.* If Krogmann's lawyers had brought *Maniccia* to the attention of the district court, the asset-freeze order would certainly have been set aside.

The State maintains attorney Nadler took reasonable steps to obtain relief from the order by filing an application for interlocutory appeal. According to the State, Nadler's efforts were frustrated by the district court's failure to rule on his post-order resistance and the decision of this court to deny interlocutory appeal. With respect to

attorney Brown, the State asserts it was reasonable for him to regard further challenge as fruitless in light of the fact that the district court declined to rule on the post-order resistance and this court's denial of interlocutory review.

The PCR court found Krogmann's attorneys should have insisted the district court rule on the resistance to the asset-freeze application or insisted upon a hearing before the district court. The PCR court further found the failure to do so fell below the standard of care of a reasonably competent attorney.

We agree. Nadler identified the asset-freeze order as "outrageous." A brief amount of research would have uncovered the *Maniccia* case, which the State did not cite in its naked application for the asset freeze nor did Nadler cite in Krogmann's resistance. If the district court had been made aware of *Maniccia* and the defense's inability to contest the order prior to its entry because of the incorrect service address, we have no doubt the district court would have granted Krogmann relief. The concept this court embraced in *Krogmann I*, namely, that contested matters must be brought to the attention of the district court "at a time when corrective action can be taken," is a commonplace proposition well within the grasp of a reasonably competent lawyer. *See* 804 N.W.2d at 524 (quoting *Top of Iowa Coop. v. Sime Farms, Inc.*, 608 N.W.2d 454, 470 (Iowa 2000) (en banc)). We think the failure of Krogmann's trial counsel to bring the asset-freeze matter to the attention of the district court fell below the standard of reasonably competent lawyers.

**D. Consequences of the Unlawful Asset Freeze.** Under the unlawful asset freeze, Krogmann was denied access to his property, which he otherwise could have converted to cash for any lawful purposes without court approval. Not only could the requirement of obtaining

court approval have had a generalized chilling effect on Krogmann's use of his assets by erecting a barrier between Krogmann and his assets, but the record here demonstrates the unlawful asset freeze adversely affected Krogmann's ability to defend himself in the criminal proceeding on several specific occasions.

First, Krogmann was denied access to his property for purposes of posting bond. Under the Iowa Constitution and Iowa law, a criminal defendant has a right to bail. Iowa Const. art. I, § 12 ("All persons shall, before conviction, be bailable, by sufficient sureties, except for capital offences where the proof is evident, or the presumption great."); Iowa Code § 811.1 (providing "[a]ll defendants are bailable both before and after conviction, by sufficient surety, or subject to release upon condition or on their own recognizance," except for defendants awaiting judgment of conviction and sentencing following a plea or verdict of guilty or appealing a conviction for certain offenses). The district court originally set bail at $750,000 cash only. When Krogmann sought a bail reduction, the district court increased bail to $1,000,000 cash only. At that point, under the district court's order, Krogmann was entitled to pretrial release if he could post the required cash. *See* Iowa Const. art. I, § 12; Iowa Code § 811.1; *id.* § 811.2(1) (listing possible conditions of pretrial release including a cash deposit).

Yet when it appeared Krogmann might be able to raise the necessary funds to comply with the district court's order setting bail, the State passively acquiesced to Smith using the asset-freeze order as a mechanism to block Krogmann's exercise of his right to bail. In doing so, the State ignored the teaching of *United States v. Salerno* that "a primary function of bail is to safeguard the courts' role in adjudicating the guilt or innocence of defendants." *See* 481 U.S. 739, 753, 107 S. Ct. 2095, 2104

(1987).  The State's asset freeze created a mechanism through which Smith could object to Krogmann mortgaging his property for bail money and effectively converted the $1,000,000–cash-only bail order into a no-bail order that prevented Krogmann's pretrial release.  The unlawful asset freeze was thus used for an unlawful purpose, namely, defeating Krogmann's right to pretrial release under the district court's pretrial bail order.

It is well-established that pretrial release can impact the ability of an accused to defend in a criminal proceeding.  As was noted long ago, "[T]he detainee is more apt to be convicted than if he were free on bail; and, if convicted, he is more apt to receive a tougher sentence."  Vera Inst. of Justice, *Programs in Criminal Justice Reform: Ten-Year Report 1961–1971*, at 19 (1972) [hereinafter Vera Inst.], https://storage.googleapis.com/vera-web-assets/downloads/Publications/programs-in-criminal-justice-reform-vera-institute-of-justice-ten-year-report-1961-1971/legacy_downloads/1002.pdf.  "Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships."  *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S. Ct. 854, 863 (1975).  Further, the defendant detained prior to trial is "hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense."  *Barker v. Wingo*, 407 U.S. 514, 533, 92 S. Ct. 2182, 2193 (1972); *accord* Criminal Justice Policy Program, Harvard Law Sch., *Moving Beyond Money: A Primer on Bail Reform* 4 (2016) [hereinafter Criminal Justice Policy Program], cjpp.law.harvard.edu/assets/FINAL-Primer-on-Bail-Reform.pdf [http://web.archive.org/web/20180527051552/http://cjpp.law.harvard.edu/assets/FINAL-Primer-on-Bail-Reform.pdf]; Will Dobbie et al., *The Effects of Pre-Trial Detention on Conviction, Future Crime, and Employment:*

*Evidence from Randomly Assigned Judges* 3 (2016), https://scholar.princeton.edu/sites/default/files/wdobbie/files/dgy_bail _0.pdf [http://web.archive.org/web/20180524234649/https://scholar. princeton.edu/sites/default/files/wdobbie/files/dgy_bail_0.pdf]. Common sense tells us Krogmann's ability to take command of his defense must have been impaired by his pretrial incarceration.

Second, under the unlawful asset-freeze order, Krogmann was denied funds to make phone calls from jail. The State objected to an expenditure of $500 per month as extravagant, and the district court agreed. The proposed expenditure of $500 per month during the period of pretrial detention would have had virtually no impact on Krogmann's ability to pay restitution as his assets were in the millions of dollars.

But the denial of funds for phone privileges likely adversely affected his ability to engage in his own defense. Where a pretrial detainee is attempting to gather evidence or work on his or her case by making phone calls from jail, those phone calls are more expensive than those made from home and may not be a protected form of communication. *See, e.g.*, Bernadette Rabuy & Daniel Kopf, Prison Policy Initiative, *Detaining the Poor* 6–7 (2016), https://www. prisonpolicy.org/reports/DetainingThePoor.pdf [http://web.archive.org/ web/20180303234357/https://www.prisonpolicy.org/reports/Detaining ThePoor.pdf]; Drew Kukorowski, *The Price to Call Home: State-Sanctioned Monopolization in the Prison Phone Industry*, Prison Pol'y Initiative (Sept. 11, 2012), https://www.prisonpolicy.org/phones/report.html [https://perma.cc/5VG7-GLNL] (noting in some states, an inmate may have to pay $1 per minute spent on the phone). By denying Krogmann a few extra dollars to use the phone from jail, the State achieved next to nothing in terms of securing payment for restitution but instead imposed

a form of pretrial punishment and made it more difficult for Krogmann to defend himself.

Third, "[t]he conventional wisdom is that most trials are won or lost in jury selection." John H. Blume et al., *Probing "Life Qualification" Through Expanded Voir Dire*, 29 Hofstra L. Rev. 1209, 1210 (2001). Yet under the unlawful asset-freeze order, Krogmann was denied a jury consultant. The State was able to object to Krogmann hiring a jury consultant on the basis that "a jury consultant is consider[ed] a luxury rather than a necessity," a reason the probate court accepted to deny Krogmann's request. Nevertheless, although controversial in some quarters, jury consultants are a well-established part of our criminal justice system and have been utilized in a wide number of cases.[7] *See, e.g.*, Marc Davis & Kevin Davis, *Pretrial Pros*, A.B.A. J., Jan. 2015, at 31, 32.

A jury consultant may have a particular role to play in a case involving mental illness. Jurors are skeptical of insanity and diminished responsibility defenses—one set of studies showed approximately two-thirds of potential jurors believed pleading insanity was a loophole that allowed guilty people to go free. *See* Nat'l Jury Project, *Criminal Defense: Practice Tools*, *in* 3 *Jurywork Systematic Techniques* § 22:28, Westlaw (database updated Nov. 2017) [hereinafter *Jurywork Systematic Techniques*]. Some authorities recommend a pretrial supplemental jury questionnaire to discern jurors' views and experience with mental illness.

---

[7]Some of the notable cases where jury consultants were utilized are O.J. Simpson's criminal trial, *see* Marc Davis & Kevin Davis, *Pretrial Pros*, A.B.A. J., Jan. 2015, at 31, 32; Bill Cosby's criminal trial, *see* Manuel Roig-Franzia, *Bill Cosby's Jury Consultants, Revealed*, Wash. Post (May 24, 2017), https://www.washingtonpost.com/news/arts-and-entertainment/wp/2017/05/24/bill-cosbys-jury-consultants-revealed/?noredirect=on&utm_term=.474f1aab6514; and the Salt Lake City Olympics bribery case, as indicated in Marygrace Schaeffer's report.

*E.g.*, James J. Gobert et al., *Jury Selection: The Law, Art and Science of Selecting a Jury* § 12:18, Westlaw (database updated Dec. 2017). Further, at the PCR hearing, Krogmann presented evidence on how the jury-selection process would have been impacted had Krogmann been permitted to retain a jury consultant.

Fourth, Krogmann claims that but for the unlawful freeze order, he would have found different or additional counsel. He testified he was unhappy with attorney Brown and was interested in contacting Des Moines attorneys. He had limited phone privileges, however, and did not have access to a Des Moines phone book. It is speculative who Krogmann might have hired as additional or substitute counsel; nonetheless, if he had been released on bail or had uninhibited access to his assets, he surely would have been more able to contact and interview potential defense lawyers.

**E. Sixth Amendment and Article I, Section 10 Rights and Structural Error.**

1. *Positions of the parties.* The real fighting issue with respect to Krogmann's claim that his lawyers were ineffective in failing to properly contest the asset-freeze order is the question of prejudice. The prejudice question breaks down into two parts. First, under the circumstances shown here, does Krogmann need to show prejudice? Second, if a showing of prejudice is required, has Krogmann met his burden under the facts of this case?

Krogmann first asserts that he is not required to show prejudice because of the type of claim he presents. Krogmann notes the United States Supreme Court has not always required a showing of actual prejudice where a defendant's constitutional rights have been infringed. *See, e.g., Arizona v. Fulminante,* 499 U.S. 279, 309–10, 111 S. Ct. 1246,

1264–65 (1991) (citing cases of structural error); *Vasquez v. Hillery*, 474 U.S. 254, 264, 106 S. Ct. 617, 624 (1986) (finding actual prejudice not required when members of defendant's race were excluded from grand jury); *Waller v. Georgia*, 467 U.S. 39, 49–50, 104 S. Ct. 2210, 2217 (1984) (noting structural error in the denial of a public trial); *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8, 104 S. Ct. 944, 950 n.8 (1984) (finding the right to self-representation at trial "is not amenable to 'harmless error' analysis"); *Gideon v. Wainwright*, 372 U.S. 335, 344–45, 83 S. Ct. 792, 796–97 (1963) (finding the total deprivation of the right to counsel warranted reversal of defendant's conviction); *Tumey v. Ohio*, 273 U.S. 510, 535, 47 S. Ct. 437, 445 (1927) (reversing defendant's conviction where judge was not impartial at trial). Krogmann notes that in *Lado v. State*, we held the failure of counsel to avoid dismissal of the PCR application for want of prosecution amounted to structural error not requiring a showing of prejudice. 804 N.W.2d 248, 252–53 (Iowa 2011).

Krogmann specifically draws our attention to *United States v. Stein* (*Stein I*), 435 F. Supp. 2d 330 (S.D.N.Y. 2006), *aff'd*, 541 F.3d 130 (2d Cir. 2008). In that complex case, the defendants' employer, due to the government's efforts and pressure, discontinued its long-standing practice of advancing attorney fees and costs to its employees charged with crimes. *Id.* at 353. The Southern District of New York held, among other things, the government's efforts to deprive the defendants of employer-provided resources violated the right-to-counsel provision of the Sixth Amendment. *Id.* at 365–66. The court concluded the defendants did not need to show prejudice to obtain relief because the government's interference with the use of funds lawfully available to the defendants was structural error. *Id.* at 370–73.

Krogmann alternatively argues, even if he must show prejudice, he has met any prejudice requirement in this case. First, he notes the asset freeze prejudiced him because he could not hire a jury consultant. Krogmann draws our attention to the testimony of his jury expert at the PCR hearing, Marygrace Schaeffer. Schaeffer concluded the lack of identification of alternates made jury selection more problematic, Krogmann's lawyer did too much talking and did not allow jurors to speak freely to identify bias during voir dire, and it was "very unusual" in this type of case not to have any challenges for cause. According to Schaeffer, it was "highly likely" that a different jury would have been impaneled if she had been allowed to participate in jury selection.

Second, Krogmann asserts he would have posted bail had he been allowed access to his money. Had he been free on bond, he would have had unfettered access to his lawyers, his family, and mental health professionals. Additionally, neither the letters Krogmann sent to his family, which the State utilized at sentencing, nor the 474 pages of written communication between Krogmann and his counsel would have been generated.

Third, Krogmann emphasizes if he had access to his considerable funds, he would have assembled "the best defense team." He would have hired a new lawyer, or perhaps multiple lawyers, and multiple mental health experts to aid him in dealing with his diminished responsibility defense. He claims his PCR mental health expert, Dr. Greenfield, offered better testimony than his criminal trial mental health expert, Dr. Gallagher.

Fourth, Krogmann contends he was prejudiced because the prosecution had access to his counsel's billing statements, his defense strategies, and his requests for investigation and trial preparation

expenses. He claims his counsel spent more time fighting to get paid than on the actual criminal case.

The State responds by arguing the traditional prejudice analysis of *Strickland* is fully applicable in this case. *See* 466 U.S. at 691–96, 104 S. Ct. at 2066–69. The test for prejudice, according to the State, is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Millam v. State*, 745 N.W.2d 719, 722 (Iowa 2008) (quoting *Ledezma*, 626 N.W.2d at 143).

The State recognizes that in some circumstances—for example where counsel has been completely denied, where counsel fails to subject the prosecution's case to meaningful adversarial testing, or where circumstances justify a presumption of prejudice, such as where counsel has an actual conflict of interest in representing multiple defendants—structural error is present and no showing of *Strickland* prejudice is required. *See Lado*, 804 N.W.2d at 252; *State v. Feregrino*, 756 N.W.2d 700, 707 (Iowa 2008) (citing *United States v. Cronic*, 466 U.S. 648, 659, 104 S. Ct. 2039, 2047 (1984)). However, the State asserts no such circumstances are present here. It emphasizes that, notwithstanding the asset freeze, Krogmann's lawyers continued to actively work for him— they filed a motion to suppress, retained a private investigator, filed a successful motion for a change of venue, submitted a jury questionnaire, and retained a mental health expert.

The State argues the only time funds for the defense were denied was the request for a jury consultant. Citing authority from Texas and Alabama, the State maintains a jury consultant is not a "basic" tool of defense. *See MacEwan v. State*, 701 So. 2d 66, 70 (Ala. Crim. App. 1997); *Busby v. State*, 990 S.W.2d 263, 270–71 (Tex. Crim. App. 1999).

The State claims Brown had extensive experience in picking juries in his career and that "is part of an attorney's stock-in-trade." *See Busby*, 990 S.W.2d at 271.

As to the inability to post bond because of the asset freeze, the State argues Krogmann's attorneys were not hampered by Krogmann's incarceration. The State contends, if anything, Krogmann's incarceration may have helped the defense because his lawyers knew where he was at all times.

2. *Different approaches to prejudice: distinguishing between ineffective assistance of counsel and the Sixth Amendment and article I, section 10 right of the accused to be master of his own defense.* The United States Supreme Court decided *Strickland* and *Cronic* on the same day, both of which suggest the approach to prejudice in the context of ineffective-assistance claims is diametric. This is true whether *Strickland* and *Cronic* are considered in tandem or in isolation. These cases tend to establish the parameters of the debate about the proper standard of prejudice for mistakes of trial counsel.

In *Strickland,* the Court declared that for most attorney errors, a defendant who demonstrates counsel breached a duty must also show prejudice in order to be entitled to relief. 466 U.S. at 693, 104 S. Ct. at 2067. In order to meet the required showing of prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S. Ct. at 2068.

In *Cronic,* the Court made it clear that in some circumstances, an accused is not required to show *Strickland* prejudice. 466 U.S. at 658–60, 104 S. Ct. at 2046–47. Situations where a showing of prejudice is not required for ineffective-assistance-of-counsel claims generally

manifest as what have been labeled "structural errors." *See, e.g., Lado*, 804 N.W.2d at 252. A structural error or defect has been said to arise when the flaw "affect[s] the framework within which the trial proceeds." *Fulminante*, 499 U.S. at 310, 111 S. Ct. at 1265. Structural error occurs and prejudice is presumed where, under the circumstances, the likelihood of counsel rendering effective assistance is too remote. *See Cronic*, 466 U.S. at 659–61, 104 S. Ct. at 2047–48 (citing *Powell v. Alabama*, 287 U.S. 45, 53, 56, 57–58, 53 S. Ct. 55, 58, 59, 60 (1932)). Prejudice has also been presumed for other systemic constitutional violations, such as where members of the defendant's race are excluded from grand jury proceedings, an equal protection violation, *Vasquez*, 474 U.S. at 264, 106 S. Ct. at 623–24, and where a judge has a substantial pecuniary interest in the outcome of a proceeding, a due process violation, *Tumey*, 273 U.S. at 531–32, 535, 47 S. Ct. at 444, 445.

Moreover, there is a line of Sixth Amendment cases establishing a presumption of prejudice for violations of the accused's right to be master of the defense, which is a right separate and distinct from the right to effective assistance of counsel. These cases do not raise questions about what counsel did or did not do to aid the defense. The constitutional concern in these cases is whether the accused was allowed to be master of the defense. And when the accused was not, that violation was presumptively prejudicial.

In *Faretta v. California*, the Supreme Court emphasized the ability of the defendant to be master of the defense. *See* 422 U.S. 806 *passim*, 95 S. Ct. 2525 *passim* (1975). The Court declared criminal defendants have a constitutional right, under the Sixth Amendment, to represent themselves if they wish. *Id.* at 819, 95 S. Ct. at 2533. As the Supreme Court made clear in *McKaskle*, where a defendant's right to self-

representation is denied, no showing of prejudice is required. 465 U.S. at 177 n.8, 104 S. Ct. at 950 n.8. *Faretta* and *McKaskle* have nothing to do with errors of counsel but everything to do with the ability of the accused to direct his own defense, even if the exercise of that ability does not seem to be in his or her best interest. *See, e.g., id.* ("[T]he right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant . . . ."); *see also* Erica J. Hashimoto, *Resurrecting Autonomy: The Criminal Defendant's Right to Control the Case*, 90 B.U. L. Rev. 1147, 1154–55 (2010) [hereinafter Hashimoto] ("Although *Faretta* did not use the word 'autonomy' to describe the interest it was protecting, it is clear that the concept of autonomy – the right to make and act upon one's own decisions free from government intervention – lay behind the Court's recognition of the right of self-representation. And indeed, the Court has since made clear that '[t]he right to appear *pro se* exists to affirm the dignity *and autonomy* of the accused.' " (Alteration in original.) (quoting *McKaskle*, 465 U.S. at 176–77, 104 S. Ct. at 950)).

The Supreme Court has recently built on *Faretta*'s and *McKaskle*'s principles in *United States v. Gonzalez-Lopez*, 548 U.S. 140, 126 S. Ct. 2557 (2006). In *Gonzalez-Lopez*, the central question was whether the accused was entitled to a reversal of his conviction absent a showing of prejudice from the infringement of his right to select counsel of his own choice. *Id.* at 142, 144–45, 126 S. Ct. at 2560, 2561–62. The majority, authored by Justice Scalia, emphasized "[t]he right to select counsel of one's choice . . . has been regarded as the root meaning of the constitutional guarantee [of the right to counsel]." *Id.* at 147–48, 126 S. Ct. at 2563. The Court concluded that if the state prevents the accused from being "defended by the counsel he believes to be best," the

Sixth Amendment is violated and "[n]o additional showing of prejudice is required to make the violation 'complete.' " *Id.* at 146, 126 S. Ct. at 2562.

The Court stressed the importance of not confusing "the right to counsel of choice—which is the right to a particular lawyer regardless of comparative effectiveness—with the right to effective counsel—which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed." *Id.* at 148, 126 S. Ct. at 2563. The right to choose counsel rooted in the Sixth Amendment "commands, not that a trial be fair, but that a particular guarantee of fairness be provided." *Id.* at 146, 126 S. Ct. at 2562. As correctly noted by Justice Alito's dissent, under the majority's approach, "a defendant who is erroneously required to go to trial with a second-choice attorney is automatically entitled to a new trial even if this attorney performed brilliantly." *Id.* at 160, 126 S. Ct. at 2570 (Alito, J., dissenting).

Most recently, in *McCoy v. Louisiana*, the Court again emphasized the defendant's right to be master of the defense. ___ U.S. ___, ___, 138 S. Ct. 1500, 1507–09 (2018). There, the issue was whether "allow[ing] defense counsel to concede guilt over the defendant's intransigent and unambiguous objection" violated the Sixth Amendment. *Id.* at ___, 138 S. Ct. at 1507. The Court held it did because "it is the defendant's prerogative, not counsel's, to decide on the objective of his defense." *Id.* at ___, 138 S. Ct. at 1505; *see id.* at ___, 138 S. Ct. at 1508 ("[T]he Sixth Amendment 'contemplat[es] a norm in which the accused, and not a lawyer, is master of his own defense.' " (Second alteration in original.) (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 382 n.10, 99 S. Ct. 2898, 2907 n.10 (1979))). Citing to cases such as *Faretta* and *McKaskle* and Justice Scalia's concurrence in *Martinez v. Court of Appeal of*

*California*,[8] the Court grounded its conclusion in respect for defendant autonomy. *Id.* at ____, 138 S. Ct. at 1507–09.

The majority then concluded the defendant did not need to show prejudice to obtain redress for the constitutional deprivation. *Id.* at ____, 138 S. Ct. at 1511. It noted the violation of the "protected autonomy right was complete when the court allowed counsel to usurp control of an issue within [the defendant's] sole prerogative" and characterized the "[v]iolation of a defendant's Sixth Amendment-secured autonomy" as structural error. *Id.* The Court reasoned the violation was structural error because the right at issue protects "the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty" and the effects of the violation "are too hard to measure." *Id.* (quoting *Weaver v. Massachusetts*, 582 U.S. ____, ____, 137 S. Ct. 1899, 1908 (2017)).

3. *Asset forfeiture cases addressing the ability of the defendant to be master of the defense.* The United States Supreme Court has considered the impact of asset forfeitures on the ability of defendants to be represented by counsel of choice in three cases. In *Caplin & Drysdale, Chartered v. United States* and *United States v. Monsanto*, the Supreme Court considered whether the pretrial forfeitures of assets in the defendants' possession were constitutionally permissible where the defendants desired to use those assets to pay their attorneys. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 619, 109 S. Ct. 2646, 2649 (1989); *United States v. Monsanto*, 491 U.S. 600, 602, 109 S. Ct. 2657, 2659 (1989). In these cases, the assets involved were "tainted,"

---

[8]In his concurrence in *Martinez*, Justice Scalia noted, "Our system of laws generally presumes that the criminal defendant, after being fully informed, knows his own best interests and does not need them dictated by the State." 528 U.S. 152, 165, 120 S. Ct. 684, 693 (2000) (Scalia, J., concurring in the judgment).

meaning they were allegedly connected with illegal transactions. *Caplin & Drysdale*, 491 U.S. at 619–20, 109 S. Ct. at 2649; *Monsanto*, 491 U.S. at 602–03, 109 S. Ct. at 2659–60. A closely divided Court upheld the asset forfeitures. *Caplin & Drysdale*, 491 U.S. at 619, 109 S. Ct. at 2649; *Monsanto*, 491 U.S. at 602, 109 S. Ct. at 2659.

In the lead case of *Caplin & Drysdale*, the Court first determined the relevant federal statutes authorized the pretrial forfeiture of assets in the criminal defendant's possession. 491 U.S. at 622–23, 109 S. Ct. at 2650–51. After determining the statutes authorized the particular forfeiture, the majority examined the constitutionality of the forfeiture under the Due Process Clause of the Fifth Amendment and the right to counsel of choice as protected by the Sixth Amendment. *Id.* at 623–24, 109 S. Ct. at 2651.

In upholding the forfeiture as constitutional, the majority recognized that under *Wheat v. United States*, a person without funds is not entitled to counsel of choice. *Id.* at 624, 109 S. Ct. at 2651–52 (citing *Wheat v. United States*, 486 U.S. 153, 159, 108 S. Ct. 1692, 1697 (1988)). The Court also noted the assets subject to forfeiture were limited and a defendant might have nonforfeitable funds available to retain counsel of choice. *Id.* at 625, 109 S. Ct. at 2652. Further, the Court theorized that attorneys might be willing to undertake representation hoping their fees would be paid in the event of an acquittal or from funds the defendant may obtain in the future. *Id.*

Additionally, the majority reasoned the "taint theory" has long been recognized. *Id.* at 627, 109 S. Ct. at 2653. Under the taint theory, title to property obtained by unlawful means automatically vests with the government and the property is thus subject to forfeiture when in the possession of the defendant. *Id.* After conducting a balancing test, the

Court concluded the "strong governmental interest in obtaining full recovery of all forfeitable assets" overrode "any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense." *Id.* at 629–31, 109 S. Ct. at 2654–55.

Justice Blackmun, joined by Justices Brennan, Marshall, and Stevens, dissented. *Id.* at 635, 109 S. Ct. at 2667 (Blackmun, J., dissenting). According to Justice Blackman, "it is unseemly and unjust for the Government to beggar those it prosecutes in order to disable their defense at trial." *Id.* Justice Blackman asserted the majority

> has lost track of the distinct role of the right to counsel of choice in protecting the integrity of the judicial process, a role that makes "the right to be represented by privately retained counsel . . . the primary, preferred component of the basic right" protected by the Sixth Amendment.

*Id.* at 645, 109 S. Ct. at 2672–73 (omission in original) (quoting *United States v. Harvey*, 814 F.2d 905, 923 (4th Cir. 1987), *rev'd sub nom. In re Forfeiture Hearing as to Caplin & Drysdale, Chartered*, 837 F.2d 637, 644–45 (4th Cir. 1988) (en banc), *aff'd sub nom. Caplin & Drysdale*, 491 U.S. at 622, 109 S. Ct. at 2650 (majority opinion)). Justice Blackman emphasized that when the government chooses a lawyer for a defendant, the "relationship of trust is undermined: counsel is too readily perceived as the Government's agent rather than his own." *Id.* at 645, 109 S. Ct. at 2673 (Blackmun, J., dissenting).

But perhaps most troubling, according to Justice Blackman, "is the fact that forfeiture statutes place the Government in the position to exercise an intolerable degree of power over any private attorney who takes on the task of representing a defendant in a forfeiture case." *Id.* at 650, 109 S. Ct. at 2675. Justice Blackman feared "[t]he Government will be ever tempted to use the forfeiture weapon against a defense attorney

who is particularly talented or aggressive on the client's behalf—the attorney who is better than what, in the Government's view, the defendant deserves." *Id.*

Most recently, the Supreme Court decided *Luis v. United States*, 578 U.S. ___, 136 S. Ct. 1083 (2016). In *Luis*, the government obtained a pretrial order restraining the untainted assets of an accused charged with conspiracy to commit healthcare fraud, conspiracy to defraud the United States and to commit offenses against the United States, and paying healthcare kickbacks. *Id.* at ___, 136 S. Ct. at 1087 (plurality opinion). The Court noted that under relevant legal tradition, an accused may sell all her property to assist in preparing for her defense at trial. *Id.* at ___, 136 S. Ct. at 1093–94. The Court concluded a defendant has a Sixth Amendment right to use her own untainted assets to pay a reasonable fee for the counsel of her choice. *Id.* at ___, 136 S. Ct. at 1096.

Additionally, an important related case is *Stein*. In *Stein*, the government indicted employees of KPMG, then one of the world's largest accounting firms. *Stein I*, 435 F. Supp. 2d at 336. The government also considered indicting KPMG as a firm. *Id.* at 339. Pursuant to policy contained in what became known as the Thompson Memorandum, the government sought to convince KPMG to discontinue its long-standing practice of paying the defense expenses of its employees charged with crimes as a way to avoid indictment.[9] *Id.* at 337, 340–45. Ultimately, the firm agreed to discontinue its practice. *Id.* at 344–46. The indicted employee-defendants claimed the government's efforts to cause KPMG to

---

[9]The Thompson Memorandum stated in pertinent part that the willingness of a corporate employer to pay such expenses would be a factor in determining whether the firm itself should be indicted. *Stein I*, 435 F. Supp. 2d at 337.

cease payment of defense expenses violated the Fifth Amendment's Due Process Clause and the Sixth Amendment right to counsel. *See id.* at 350, 356.

The Southern District of New York first concluded the government's efforts violated the defendants' due process rights to fairness in criminal proceedings. *Id.* at 356–65. According to the court, due process, "[i]n everyday language," entitled a defendant to "a fair shake." *Id.* at 357. The court emphasized that "[o]ne aspect of the required fairness protects the autonomy of the criminal defendant." *Id.* As a result, the government is prevented "from interfering with the manner in 'which the individual wishes to present a defense.' " *Id.* at 357 & n.126 ("This general rule against government interference with the defense is based on a presumption that the criminal defendant, 'after being fully informed, knows his own best interests and does not need them dictated by the State.' " (quoting *Martinez v. Ct. of Appeal of Cal.*, 528 U.S. 152, 165, 120 S. Ct. 684, 693 (2000) (Scalia, J., concurring in the judgment))). The court also reasoned "fairness in criminal proceedings requires that the defendant be firmly in the driver's seat, and that the prosecution not be a backseat driver." *Id.* at 358. The court held "a criminal defendant has a right to obtain and use in order to prepare a defense resources lawfully available to him or her, free of knowing or reckless government interference." *Id.* at 361.

Additionally, the court found the government's efforts violated the right-to-counsel provision of the Sixth Amendment because the Sixth Amendment protects the right "to use one's own funds to mount the defense that one wishes to present." *Id.* at 365–66. On the issue of whether the defendants must show prejudice to obtain relief from the right-to-counsel violation, the court concluded no showing of prejudice

was required.  *Id.* at 369.  Relying on *Gonzalez-Lopez* from the Supreme Court, the *Stein I* court declared the violation is complete when the defendant is deprived of the use of funds that he or she is entitled to use for defense.  *Id.* (citing *Gonzalez-Lopez*, 548 U.S. at 148, 126 S. Ct. at 2563 (majority opinion)).  Alternatively, the court reasoned no showing of prejudice is required because the constitutional deprivations arising from the government's interference with the use of funds lawfully available to the defendants was structural error.  *Id.* at 370–73.

On appeal, the Second Circuit agreed the defendants were deprived of their Sixth Amendment right to counsel.[10]  *United States v. Stein* (*Stein II*), 541 F.3d 130, 157 (2d Cir. 2008).  The Second Circuit stated, "In a nutshell, the Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain."  *Id.* at 156.  The appellate court acknowledged some of the *Stein* defendants "do not claim they were deprived of their chosen counsel[; r]ather, they assert that the government unjustifiably interfered with their relationship with counsel and their ability to defend themselves."  *Id.* at 157.  The court concluded,

> these defendants can easily demonstrate interference in their relationships with counsel and impairment of their ability to mount a defense based on [the district court's] non-erroneous findings that the post-indictment termination of fees "caused them to restrict the activities of their counsel," and thus to limit the scope of their pre-trial investigation and preparation.

*Id.* (quoting *United States v. Stein*, 495 F. Supp. 2d 390, 418 (S.D.N.Y. 2007)).  In agreeing with the district court that the appropriate remedy for the violation was dismissal of the defendants' indictments, the Second

---

[10]The Second Circuit did not address the district court's Fifth Amendment due process ruling because it resolved the case on Sixth Amendment right-to-counsel grounds.  *Stein II*, 541 F.3d at 136.

Circuit did not require the defendants to show prejudice before obtaining relief.[11] *Id.*

4. *Application of Sixth Amendment and article I, section 10 structural error principles to this case.* At the outset, it is important, as the Court emphasized in *Gonzalez-Lopez*, to distinguish between claims of ineffective assistance of counsel and other claims based on the Sixth Amendment (and article I, section 10 of the Iowa Constitution) right to counsel, such as the right to conduct one's own defense. *See* 548 U.S. at 148, 126 S. Ct. at 2563; *see also McCoy*, ___ U.S. at ____, 138 S. Ct. at 1510–11 ("Because a client's autonomy, not counsel's competence, is in issue, we do not apply our ineffective-assistance-of-counsel jurisprudence . . . ."); *United States v. Rosen*, 487 F. Supp. 2d 721, 727 n.8 (E.D. Va. 2007) (concluding "the right to expend one's resources towards one's defense" is "a Sixth Amendment right independent of the right to counsel of choice or to effective counsel"). In this case, it is true, of course, that Krogmann's claim with respect to the asset freeze is couched in terms of ineffective assistance of counsel. The underlying claim, however, is not simply that Krogmann's counsel breached a duty by failing to properly challenge the asset freeze as unlawful. Rather, the underlying claim is the asset freeze prevented Krogmann from being the master of his own defense in violation of the Sixth Amendment and the Iowa Constitution. *See McCoy*, ___ U.S. at ____, 138 S. Ct. at 1510–11; *cf.* Corrected Brief for Petitioner at 43 n.9, *McCoy v. Louisiana*, ___ U.S.

---

[11]Notably, the *Stein* proceedings, unlike the case before us, were still in the pretrial stage. *See Stein II*, 541 F.3d at 158 n.15. Accordingly, the Second Circuit recognized it was not considering the application of its holding to a situation where the defendant proceeds to trial, is forced to limit the scope of his or her attorney's efforts due to the defendant's financial constraints arising from unlawful government interference, and "is convicted based on overwhelming evidence of his or her guilt." *Id.* Nevertheless, we examine the *Stein* cases as persuasive authority and find the courts' analyses illuminating.

____, 138 S. Ct. 1500 (2018) (No. 16-8255), 2017 WL 6885223, at *43 n.9 (acknowledging McCoy did not challenge the loss of his autonomy via an ineffective-assistance claim on direct appeal but reserved the ineffective-assistance claim for development in postconviction proceedings, which ultimately gave rise to the case before the Court).

As indicated in *Stein I* and *II*, Krogmann is entitled to be in control of his own defense effort. *See Stein II*, 541 F.3d at 156; *Stein I*, 435 F. Supp. 2d at 357–58; *see also Faretta*, 422 U.S. at 833–34, 834 n.45, 95 S. Ct. at 2540 & n.45 ("[W]hatever else may be said of those who wrote the Bill of Rights, surely there can be no doubt that they understood the inestimable worth of free choice."); Hashimoto, 90 B.U. L. Rev. at 1148 (noting the Court's holding in *Faretta* "reflected a broad and powerful principle – namely, that the right to control the defense of one's own case has deep roots in both the text and history of the Constitution"). The right to be master of his defense is a right personal to him. *See Faretta*, 422 U.S. at 834, 95 S. Ct. at 2540–41 ("The right to defend is personal. . . . And although [the defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" (quoting *Illinois v. Allen*, 397 U.S. 337, 350–51, 90 S. Ct. 1057, 1064 (1970) (Brennan, J., concurring))); *Stein I*, 435 F. Supp. 2d at 357–58; Note, *Rethinking the Boundaries of the Sixth Amendment Right to Counsel of Choice*, 124 Harv. L. Rev. 1550, 1550 (2011) ("Criminal defense is personal business. For this reason, the Constitution's ample procedural protections for criminal defendants are written not just to provide a fair trial, but also to put the defendant in control of his own defense."). He has the right to spend all or very little of his assets on his legal defense, *see Luis*, ___ U.S. at ___, 136 S. Ct. at 1094; *Stein II*, 541 F.3d at 156;

*Stein I*, 435 F. Supp. 2d at 361–62, 366, or, indeed, the right to defend himself under *Faretta*, *see* 422 U.S. at 819, 95 S. Ct. at 2533.

The government, of course, has every right to administer strong blows against a defendant within the confines of the adversary system. *Cf., e.g., Cronic*, 466 U.S. at 655, 104 S. Ct. at 2044–45 (" '[T]ruth,' Lord Eldon said, 'is best discovered by powerful statements on both sides of the question.' " (Alteration in original.) (quoting Irving R. Kaufman, *Does the Judge Have a Right to Qualified Counsel?*, 61 A.B.A. J. 569, 569 (1975))); *Gideon*, 372 U.S. at 344, 83 S. Ct. at 796 (noting governments "quite properly" spend vast amounts of money to prosecute). It has every right to pursue, and public order depends, upon its effective advocacy in criminal prosecutions. *See, e.g., Gideon*, 372 U.S. at 344, 83 S. Ct. at 796 ("Lawyers to prosecute are everywhere deemed essential to protect the public's interest in an orderly society."). While the government has every right to control the development of its trial strategy and profile, it has no right to shape or control the development of trial strategy and profile by the defense. *See, e.g., Stein I*, 435 F. Supp. 2d at 357 ("The underlying theme is that the government may not both prosecute a defendant and then seek to influence the manner in which he or she defends the case."); *id.* at 358 ("The constitutional requirement of fairness in criminal proceedings not only prevents the prosecution from interfering actively with the defense, but also from passively hampering the defendant's efforts."); *see also Caplin & Drysdale*, 491 U.S. at 635, 109 S. Ct. at 2667; *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532 (1984) ("We have long interpreted this [Fourteenth Amendment due process] standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense."); *cf. McCoy*, ___ U.S. at ___, 138 S. Ct. at 1508 (noting the

defendant must be "master of his own defense" even if trial management is within the province of the attorney (quoting *Gannett Co.*, 443 U.S. at 382 n.10, 99 S. Ct. at 2907 n.10)); *Cronic*, 466 U.S. at 657, 104 S. Ct. at 2046 ("While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators." (quoting *United States ex rel. Williams v. Twomey*, 510 F.2d 634, 640 (7th Cir. 1975))). The government must stay on its side of the line of scrimmage. *See, e.g., Herring v. New York*, 422 U.S. 853, 862, 95 S. Ct. 2550, 2555 (1975) ("The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.").

That did not happen here. Not only did the State develop its own trial strategy, it crossed over to limit Krogmann's ability to defend himself in several ways. First, by freezing his assets, the State unjustifiably made it harder for Krogmann to spend his money on his defense by requiring him to obtain judicial approval of expenditures, which were closely monitored by the State, the victim, and the court.

It is true the record does not establish Krogmann actually requested to hire different counsel and the district court denied that request. But the asset freeze had a chilling effect on any such thoughts Krogmann may have had. Indeed, counsel fees for his criminal defense were limited by one of the probate's court orders. Further, with respect to the personal injury case Smith filed against Krogmann, the probate court made it clear it would not allow doubling up of counsel. Any thoughts Krogmann might have developed to hire other, more expensive counsel would have been inhibited by the asset-freeze approval process.

Second, the State succeeded in "passively hampering [Krogmann's] efforts" by acquiescing to Smith's objection to Krogmann's request to mortgage his property for bail money. *See Stein I,* 435 F. Supp. 2d at 358. The ability to be master of the defense is certainly impaired by incarceration. *See, e.g., Barker,* 407 U.S. at 533, 92 S. Ct. at 2193; Criminal Justice Policy Program at 4; Vera Inst. at 19. The district court established a $1 million cash bond, but the unlawful asset freeze was used as a way to circumvent the district court's bail order and obtain additional restraint on Krogmann.

And that is not all. The State successfully objected to a request for $500 per month for phone calls and amenities while Krogmann was incarcerated. As the request would total a few thousand dollars at most out of an asset total of over $3 million, the purpose of objecting to these amenities seems primarily punitive and designed to prevent Krogmann from engaging in extensive consultations with his family and others while incarcerated. Objectively, the inability to engage in extensive communications would have impaired his ability to seek out other lawyers or vet experts.

Finally, Krogmann was prevented from hiring a jury consultant with his own funds at an estimated maximum cost of $8000. The State had no business making an objection to this kind of expenditure. Once again, the $8000 cost would have had virtually no impact on the total assets available to satisfy what turned out to be a modest restitution order.

Further, the use of jury consultants is well-established in criminal cases. Some lawyers like them; others don't. And it is probably true that

most defendants cannot afford them.[12] All this, however, is beside the point. If Krogmann wanted a jury consultant and wanted to use his funds to pay for one, he was entitled to do so.

The denial of funds for a jury consultant in this case is not a minor issue. Questions involving mental health defenses pose particular challenges for a defendant. *See* 3 *Jurywork Systematic Techniques* § 22:28. The testimony at the PCR hearing demonstrated jury consultants, while unable to guarantee a particular outcome, can be very useful to defense lawyers and help the defendant achieve an impartial, unbiased jury.

The bottom line is clear: the State in this case was playing on both sides of the line of scrimmage. It not only structured its own case, but it unjustifiably crossed the line and prevented Krogmann from mounting the kind of defense he otherwise would have been able to. *See Stein II*, 541 F.3d at 157 (finding constitutional violation where defendants were forced to limit their defenses, which they would not have done but for the government's unjustifiable interference); *cf. McCoy*, ___ U.S. at ____, 138 S. Ct. at 1509 (noting defense counsel must develop a trial strategy but that if the defendant disagrees with the proposed strategy, defense counsel cannot usurp control). The cumulative effect of the State's actions was to limit Krogmann's ability to spend his own assets on his own defense from almost the beginning of the criminal proceedings. No doubt the State believed Krogmann was guilty and did not deserve anything other than pretrial punishment.[13] But that is not the way our

---

[12]We note this case does not involve an indigent defendant's request for or right to a jury consultant, and therefore, we do not address or resolve legal questions that might arise in this context.

[13]Tellingly, for example, at the bond reduction hearing, county attorney Bernau pointed to the fact that Krogmann had admitted to shooting Smith as a reason for

adversary system works. *See, e.g.,* Iowa Code § 811.2(1) (enumerating conditions of pretrial release that can be imposed based on whichever conditions will assure *only* the defendant's appearance and that the defendant's release will not jeopardize the safety of others); *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S. Ct. 1861, 1872 (1979) ("For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."); Marc Miller & Martin Guggenheim, *Pretrial Detention and Punishment,* 75 Minn. L. Rev. 335, 357 (1990) ("The rule that the state may not punish an offender without a complete trial and due process of law is the most basic constitutional principle relating to criminal law."); *cf. Escobedo v. Illinois,* 378 U.S. 478, 490, 84 S. Ct. 1758, 1764–65 (1964) ("If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system."). And where the defendant is deprived of his right to personally conduct his defense, structural error is present. *See, e.g., McCoy,* \_\_\_ U.S. at \_\_\_, 138 S. Ct. at 1511 ("Violation of a defendant's Sixth Amendment-secured autonomy ranks as error of the kind our decisions have called 'structural' . . . ."); *Gonzalez-Lopez,* 548 U.S. at 150, 126 S. Ct. at 2564–65; *McKaskle,* 465 U.S. at 177 n.8, 104 S. Ct. at 950 n.8; *see also Luis,* 598 U.S. at \_\_\_, 136 S. Ct. at 1094; *Faretta,* 422 U.S. at 820–21, 95 S. Ct. at 2533–34 (emphasizing counsel is merely a defense tool to aid a defendant willing to use such a tool).

A case involving an unlawful, total freeze of the criminal defendant's assets that impairs the defendant's ability to be the master of his or her own defense is ordinarily the kind of case where prejudice

---

increasing the bond amount even though Bernau also acknowledged "we do live in a society where a person is innocent until proven guilty."

should be presumed. *See, e.g., McCoy*, ___ U.S. at ____, 138 S. Ct. at 1511 (noting an error may be considered structural and thereby presumptively prejudicial " 'if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest,' such as 'the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty' " (quoting *Weaver*, 582 U.S. at ____, 137 S. Ct. at 1908); *Stein I*, 435 F. Supp. 2d at 371–72 (finding structural error because the government's efforts "limited what the KPMG Defendants can pay their lawyers to do" and "government interference with those resources that a defendant does have or legally may obtain fundamentally alters the structure of the adversary process"). Based on his testimony at trial, Krogmann admitted shooting the victim. His defense at trial was diminished responsibility, which can negate specific intent. The crimes with which Krogmann was charged—attempted murder and willful injury causing serious injury—are both specific intent crimes. *See State v. Young*, 686 N.W.2d 182, 185 (Iowa 2004) (attempted murder); *State v. Hickman*, 623 N.W.2d 847, 852 (Iowa 2001) (en banc) (willful injury causing serious injury). We simply have no way of knowing whether Krogmann would have hired different lawyers, what kind of evidentiary presentation might have been made if Krogmann was out on bail and more able to participate in his defense, what kind of or how many experts he would have hired, and what kind of jury would have been selected had Krogmann not been stymied by the asset freeze and allowed to be master of his own defense. *See, e.g., McCoy*, ___ U.S. at ____, 138 S. Ct. at 1511 (noting an error may be structural and thereby presumptively prejudical "when its effects are too hard to measure").

**F. Issue of Prejudice in PCR Proceedings Where Mistakes of Trial Counsel Produced Structural Error at Trial.** It is true, of course, that this case is presented in a PCR proceeding. The question thus arises as to whether, in a case involving an unpreserved structural error at trial that is challenged via an ineffective-assistance claim in PCR, a showing of *Strickland* prejudice is required in the PCR proceedings.

A recent United States Supreme Court case on whether *Strickland* prejudice is required in PCR proceedings where the underlying error was structural in nature is *Weaver*. In *Weaver*, during the petitioner's trial on state criminal charges, "the courtroom was occupied by potential jurors and closed to the public for two days of the jury selection process." 582 U.S. at ____, 137 S. Ct. at 1905. Defense counsel did not object at trial and the issue was not raised on direct review. *Id.* at ____, 137 S. Ct. at 1905.

Five years later, Weaver filed a motion for a new trial in state court, claiming his attorney provided ineffective assistance of counsel under the Sixth Amendment by failing to object to the courtroom closure. *Id.* at ____, 137 S. Ct. at 1906. The Massachusetts state courts denied the motion because Weaver had not established *Strickland* prejudice from his defense counsel's failure to object. *Id.* at ____, 137 S. Ct. at 1906–07. Weaver then appealed to the United States Supreme Court. *Id.* at ____, 137 S. Ct. at 1905, 1907.

The Court began its analysis of structural error by noting there are at least three different rationales for structural error. *Id.* at ____, 137 S. Ct. at 1908. The first rationale derives from cases where "the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest." *Id.* at ____, 137 S. Ct. at 1908. The *Weaver* Court cited as an example the defendant's right to conduct

his own defense, which while usually leading to unfavorable outcomes, "is based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty." *Id.* at \_\_\_\_, 137 S. Ct. at 1908. For this type of right, harm from the deprivation thereof "is irrelevant to the basis underlying the right." *Id.* at \_\_\_\_, 137 S. Ct. at 1908.

A second rationale for characterizing an error as structural is when "the effects of the error are simply too hard to measure." *Id.* at \_\_\_\_, 137 S. Ct. at 1908. An example is when a defendant is denied the right to select his or her own attorney. *Id.* at \_\_\_\_, 137 S. Ct. at 1908. In such settings, according to the *Weaver* Court, the efficiency costs of letting the government attempt to make its case are unjustified. *Id.* at \_\_\_\_, 137 S. Ct. at 1908.

A third rationale for structural error involves "error [that] always results in fundamental unfairness." *Id.* at \_\_\_\_, 137 S. Ct. at 1908. Examples of this third type of structural error include "if an indigent defendant is denied an attorney or if the judge fails to give a reasonable-doubt instruction." *Id.* at \_\_\_\_, 137 S. Ct. at 1908.

The Court noted it treats an unconstitutional courtroom closure as a structural error "[i]n the direct review context." *Id.* at \_\_\_\_, 137 S. Ct. at 1905. And it assumed, for purposes of the case, that counsel breached an essential duty by failing to object to the unconstitutional lack of public trial. *Id.* at \_\_\_\_, 137 S. Ct. at 1905. Nevertheless, the *Weaver* Court declared that when a public trial claim is raised via ineffective assistance of counsel under the Sixth Amendment, *Strickland* prejudice is not automatically shown. *Id.* at \_\_\_\_, 137 S. Ct. at 1911. Rather, the defendant must show

> either a reasonable probability of a different outcome in his or her case or, as the Court has assumed for these purposes, to show that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair.

*Id.* at \_\_\_\_, 137 S. Ct. at 1911 (citation omitted).

In *Weaver*, the Supreme Court emphasized the prejudice requirement "derives both from the nature of the error and the difference between a public-trial violation preserved and then raised on direct review and a public-trial violation raised as an ineffective-assistance-of-counsel claim." *Id.* at \_\_\_\_, 137 S. Ct. at 1912 (citation omitted). The Court further observed that ordering a new trial in a PCR proceeding involves risks of inaccurate witness memories or lost physical evidence due to time lapse and undermined the state's interest in finality. *Id.* at \_\_\_\_, 137 S. Ct. at 1912.

Justice Breyer, joined by Justice Kagan, dissented. *Id.* at \_\_\_\_, 137 S. Ct. at 1916 (Breyer, J., dissenting). Justice Breyer characterized the majority as holding only those structural errors that lead to fundamental unfairness warrant relief in postconviction proceedings without a showing of *Strickland* prejudice. *Id.* at 1916 (Breyer, J., dissenting). Justice Breyer, however, asserted all structural errors have features that "make them 'defy analysis by "harmless-error" standards.' " *Id.* at \_\_\_\_, 137 S. Ct. at 1917 (quoting *Fulminante*, 499 U.S. at 309, 111 S. Ct. at 1265).

*Weaver* on its face is limited solely to postconviction claims alleging ineffective assistance for failure to assert a right to a public trial. *Id.* at \_\_\_\_, 137 S. Ct. at 1907 (majority opinion). The question arises whether the *Weaver* holding will be limited to the right to public trial or be extended to other contexts. Two recent cases show differing approaches.

In *Commonwealth v. Diaz*, a Pennsylvania court held *Weaver* did not apply to a PCR case where criminal defense counsel did not understand the defendant needed a translator at his first day of trial. 183 A.3d 417, 424 & n.6 (Pa. Super. Ct. 2018). Counsel's failure to object to the lack of a translator violated the defendant's right to the assistance of counsel under the Pennsylvania Constitution. *Id.* at 422–24. The Pennsylvania court concluded that

> [b]ecause the rights at issue in this case involve Appellee's inability to comprehend the criminal proceedings and not the right to keep the courtroom open during *voir dire*, the rights at issue are wholly and strikingly different from those in *Weaver*.

*Id.* at 424 & n.6.

On the other hand, in *Newton v. State*, the Maryland high court considered a case involving structural error presented in a PCR proceeding. 168 A.3d 1, 6–7 (Md. 2017). The underlying error was the presence of an alternate juror in the jury's deliberations. *Id.* at 4. The *Newton* court, applying *Weaver*, required a showing of prejudice in the context of a postconviction-relief challenge. *Id.* at 9–10.

Most recently, in *McCoy*, the Supreme Court, on review of a postconviction proceeding, did not require a showing of *Strickland* prejudice when the defendant's trial counsel infringed the defendant's Sixth Amendment right to be master of his own defense. ___ U.S. at ___, 138 S. Ct. at 1510–11. Instead, the Court stated,

> Because a client's autonomy, not counsel's competence, is in issue, we do not apply our ineffective-assistance-of-counsel jurisprudence . . . to McCoy's claim. To gain redress for attorney error, a defendant ordinarily must show prejudice. Here, however, the violation of McCoy's protected autonomy right was complete when the court allowed counsel to usurp control of an issue within McCoy's sole prerogative.

*Id.* at \_\_\_\_, 138 S. Ct. at 1510–11 (citations omitted).

Notwithstanding *Weaver* and based on analogy to *McCoy*, we think prejudice should be presumed in a postconviction-relief proceeding for the type of structural error presented in this case. Krogmann has been harmed twice: once by the government when it took unlawful steps to freeze his assets, and once by his lawyers who failed to properly preserve the issue in the district court. The Sixth Amendment and article I, section 10 rights that were unlawfully truncated by the State in this case are not minor or inconsequential. Unlike in *Weaver*, the constitutional error here affected the entire proceeding and not just two days of pretrial jury voir dire. *See* 582 U.S. at \_\_\_\_, 137 S. Ct. at 1905. Further, unlike in *Weaver*, the purposes of the underlying rights are to protect the liberty and autonomy of the criminal defendant and ensure fairness in criminal proceedings. *See id.* at \_\_\_\_, 137 S. Ct. at 1908; *see also Stein I*, 435 F. Supp. 2d at 372 ("[T]he government's interference in the KPMG Defendants' ability to mount a defense 'creates an appearance of impropriety that diminishes faith in the fairness of the criminal justice system in general.' This injury to the criminal justice system is not dependent on whether or not the KPMG Defendants ultimately are convicted or—more to the point—whether they would have been convicted even if the government had not interfered with their constitutional right to counsel." (quoting *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 811, 107 S. Ct. 2124, 2139 (1987) (plurality opinion))). Moreover, like in *McCoy*, the violation of Krogmann's protected autonomy right was complete when the court allowed the State and the victim to unlawfully wrestle away control of issues that were within Krogmann's sole prerogative—his ability to attempt to generate bail money by mortgaging his farmland and his choice to have a jury consultant at trial. *See* \_\_\_ U.S. at \_\_\_\_, 138 S. Ct. at 1511; *see also*

*Stein I*, 435 F. Supp. 2d at 369 ("The government has interfered with the KPMG Defendants' right to be represented as they choose, subject to the constraints imposed by the resources lawfully available to them. This violation . . . is complete irrespective of the quality of the representation they receive. Thus, *Strickland* has no bearing here."). We therefore conclude Krogmann is not required to show actual prejudice in this case. We make our holding under article I, section 10 of the Iowa Constitution. *See Young*, 686 N.W.2d at 185.

**IV. Krogmann's Other Ineffective-Assistance, Prosecutorial-Misconduct, and Consecutive-Sentences Claims.**

Because we conclude Krogmann is entitled to a new trial with full, lawful access to his assets in preparing his defense, we do not address his other claims of ineffective assistance or prosecutorial misconduct. However, because the issue of whether consecutive sentences for attempted murder and willful injury violates the Double Jeopardy Clause and the merger doctrine may arise upon retrial, we briefly address the issue here.

Krogmann claims his consecutive sentences for attempted murder and willful injury violate the Double Jeopardy Clause of the Fifth Amendment and the merger doctrine. He contends willful injury is a lesser included offense of attempted murder because, under the facts of his case, he could not have committed attempted murder without also committing willful injury as the actus reus component of each crime is the same and the mens rea required for attempted murder satisfies the mens rea requirement for willful injury. He acknowledges his argument is contrary to our holding in *State v. Clarke*, 475 N.W.2d 193, 196 (Iowa 1991) (holding willful injury is not a lesser included offense of attempted murder), but asserts our more recent precedent has abrogated *Clarke*.

We disagree. To determine whether one offense is a lesser included offense of another, such that imposition of consecutive sentences for both offenses would violate double jeopardy and the merger doctrine, we apply the legal elements test. *State v. Braggs*, 784 N.W.2d 31, 36 (Iowa 2010).

> [U]nder the legal test the lesser offense is necessarily included in the greater offense if it is impossible to commit the greater offense without also committing the lesser offense. If the lesser offense contains an element not required for the greater offense, the lesser cannot be included in the greater.

*Id.* at 35–36 (alteration in original) (quoting *State v. Jeffries*, 430 N.W.2d 728, 740 (Iowa 1988) (en banc)). Importantly, this test is "purely a review of the legal elements and does not consider the facts of a particular case." *State v. Love*, 858 N.W.2d 721, 725 (Iowa 2015).

Thus, because Krogmann's argument would require us to focus on the particular facts of his case as opposed to the statutory elements for attempted murder and willful injury, his argument does not have merit. Moreover, we find nothing in Krogmann's arguments, our recent caselaw, or the court of appeals decision to suggest that *Clarke* is no longer good law. We decline to overrule *Clarke*'s holding that the "[a]pplication of the legal elements test plainly demonstrates that willful injury is not a lesser-included offense of attempted murder." 475 N.W.2d at 196. We affirm the decision of the court of appeals on the consecutive-sentences issue.

**V. Conclusion.**

The asset freeze in this case was unlawful and Krogmann's counsel's failure to properly challenge the freeze breached an essential duty. The consequences of the asset freeze violated Krogmann's constitutional right to be master of his defense, which is a structural error. Under the circumstances giving rise to this type of structural error in this case, we presume prejudice from Krogmann's counsel's breach.

Accordingly, we conclude Krogmann is entitled to a new trial with full, lawful access to his assets to use in preparing, presenting, and handling his defense.

Should his new trial result in convictions for attempted murder and willful injury, the sentencing court may exercise its discretion in determining whether to impose concurrent or consecutive sentences under the applicable law.

We vacate the decision of the court of appeals, except with respect to the consecutive-sentences issue, which we affirm. We reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED WITH INSTRUCTIONS.**

All justices concur except Mansfield and Waterman, JJ., who dissent.

**MANSFIELD, Justice (dissenting).**

I respectfully dissent. The asset freeze was improper. But it didn't prevent Robert Krogmann from hiring the counsel of his choice, paying his counsel's bills, and mounting a vigorous trial defense. There was no structural error, and no reason exists for Krogmann to receive a second trial.

On March 13, 2009, Krogmann arrived at his former girlfriend's home with a handgun. He used the gun to shoot her three times. The first bullet entered his ex-girlfriend's stomach, the second her arm, and the third her spine. Before initially shooting his victim, Krogmann told her, "[I]f he couldn't have me, no one was going to have me and . . . we were both going to die together that day." After firing the first two shots, Krogmann dismissed his victim's pleas with the statement that "he wasn't going to go to jail for attempted murder." Krogmann then proceeded to fire the third shot that entered her spine.

Fortunately, Krogmann's former girlfriend survived her ordeal. Unsurprisingly, Krogmann was later convicted of attempted murder and willful injury causing serious injury.

**I. No Prejudice.**

Krogmann now hypothesizes that if it hadn't been for the asset freeze, he would have had a better outcome at trial. I think not. Notwithstanding the asset freeze, Krogmann was able to replace his original defense attorney with someone else he preferred, he was able to pay all of his counsel's bills (which totaled approximately $67,000), and he was able to retain an expert psychiatrist who testified at trial.

As Krogmann's defense counsel put it, except for a jury consultant, "[A]ny item I asked for, funds for attorney fees or this or that, experts, it

seemed, from memory, to have been fully granted." Krogmann's defense counsel confirmed that he "never felt restricted or restrained from asking for funds for [Krogmann's] defense." He added that the asset freeze "did not seem to affect what [he] was doing for [Krogmann], but for [the jury consultant]."

Especially given the strength of the State's case against Krogmann, I do not believe there was any prejudice here. *See State v. Coleman*, 907 N.W.2d 124, 141 (Iowa 2018) (noting that ineffective assistance requires proof of prejudice, i.e., "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (quoting *Ledezma v. State*, 626 N.W.2d 134, 143 (Iowa 2001))).

Krogmann maintains that without the asset freeze, he would have been able to hire the jury consultant, to consider hiring additional counsel, to post bond, to retain an additional mental health expert, and to make more phone calls "to family and additional lawyers."

Both the district court and the court of appeals examined these arguments and decided none of these things would have made a difference. I agree. As the court of appeals put it, "Without belaboring the facts, we conclude there is no reasonable probability of a different outcome . . . ."

Consider, for example, the report of the additional psychiatrist retained by Krogmann for the postconviction-relief hearing. Krogmann's theory is that, but for the asset freeze, this expert could have testified as an additional expert at the time of trial. Yet all this expert could say was, "There is a *possibility* that at the time of the crime [Krogmann] may have had a brief psychotic episode as well as being severely depressed." (Emphasis added.) I fail to see how such equivocal testimony would have been of much help to Krogmann at trial.

Krogmann's arguments that he would have a better result if he had hired a jury consultant or if he had posted bail are even more speculative. Most individuals charged with attempted murder are incarcerated before trial and do not have the benefit of a consultant to assist with jury selection. Yet if Krogmann's logic is correct, these individuals are being denied constitutional rights because their trial defense is being impaired. Have we now made bail in Iowa a Sixth Amendment as well as an Eighth Amendment right?

## II. No Structural Error.

Not wishing to push the prejudice point too far, the majority instead determines that the asset freeze was a structural error entitling the defendant to automatic reversal of his convictions. Here too, I have a different view.

At the outset, I pose a question: If the asset freeze was so egregious as to amount to a structural error, why did we not grant Krogmann's interlocutory appeal from the asset freeze on May 26, 2009? Our court was asked to step in and did not do so. An interlocutory appeal would have been the normal way to fix a structural error like this if it would have tainted the ensuing trial. *Cf. Luis v. United States*, 578 U.S. \_\_\_, \_\_\_, 136 S. Ct. 1083, 1087 (2016) (plurality opinion) (granting interlocutory appeal from asset freeze that prevented the defendant from hiring the counsel of her choice).

In fact, there was no structural error. The majority conflates (1) the right to select the retained counsel of one's choice with (2) a nebulous right to spend money however and whenever one chooses on one's defense. The United States Supreme Court has found denial of the former right to be a structural error. *See id.* at \_\_\_, 136 S. Ct. at 1089. But no court until today has found denial of the second right to be a

structural error. The Sixth Amendment and article I, section 10 expressly provide for a right "to have the assistance of counsel." U.S. Const. amend. VI; Iowa Const. art. I, § 10. Needless to say, they do not mention a right to the assistance of a jury consultant.

*Luis* sets forth the outer limits of what amounts to a structural error in this area. In *Luis*, the United States Supreme Court held over the dissent of three justices that a freeze of untainted assets constituted a structural error *when it affected a defendant's ability to obtain the counsel of her choice.* 578 U.S. at ___, 136 S. Ct. at 1089. As Justice Breyer stated for the plurality, "[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire." *Id.* (alteration in original) (quoting *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624, 109 S. Ct. 2646, 2652 (1989)).

Thus, in *Luis*, the government and the defendant had stipulated that the asset freeze would prevent the defendant "from using her own untainted funds, *i.e.,* funds not connected with the crime, to hire counsel to defend her in her criminal case." *Id.* at ___, 136 S. Ct. at 1088. The Court seized on this stipulation to conclude that "the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment." *Id.* at ___, 136 S. Ct. at 1089.

This case is quite different. Unlike Luis, Krogmann was not in any way prevented from hiring—or paying—the counsel of his choice. At most, the record shows that the asset freeze prevented Krogmann from hiring a jury consultant, posting bond, and making as many calls from jail as he wanted to make.

The majority opinion cites no authority—not even a law review article—for the proposition that what occurred here amounts to a structural error.

The best the majority can muster is the same case Krogmann cited to us: *United States v. Stein*, 435 F. Supp. 2d 330 (S.D.N.Y. 2006), *aff'd*, 541 F.3d 130 (2d Cir. 2008). The majority terms *Stein* an "important" case. *Stein* involved the Thompson Memorandum, a United States Department of Justice policy which sought to deter corporations from advancing legal fees to their criminally charged employees by providing that such fee payments would be taken into account in determining whether the corporation should be charged. *Id.* at 337–38. As a result of the Thompson Memorandum, a company cut off payment of its employees' legal fees when they were indicted. *Id.* at 344–45. The district court found a Sixth Amendment structural error, noting that the government's action had effectively removed the defendants' counsel of their choice and forced them to rely on appointed counsel. *Id.* at 369.

Notably, on appeal, the United States Court of Appeals for the Second Circuit later held that any structural error was limited to those defendants who were actually deprived of their "right to counsel of choice." *Stein*, 541 F.3d at 157. The remaining defendants had to show, and did show, "interference in their relationships with counsel and impairment of their ability to mount a defense." *Id.* That is exactly what Krogmann has *not* shown.[14]

The line drawn by the Second Circuit is consistent with Supreme Court precedent. In *Caplin & Drysdale*, the Supreme Court indicated

---

[14]The majority labels the district court opinion *Stein I* and the court of appeals opinion *Stein II*. But the controlling opinion is that of the court of appeals—i.e., "*Stein II*."

that "[w]hatever the full extent of the Sixth Amendment's protection of one's right to retain counsel of his choosing, that protection does not go beyond 'the individual's right to spend his own money to obtain the advice and assistance of . . . counsel.'" 491 U.S. at 626, 109 S. Ct. at 2652 (omission in original) (quoting *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 370, 105 S. Ct. 3180, 3215 (1985) (Stevens, J., dissenting)).

Furthermore, the Second Circuit in *Stein* expressly declined to address the following situation:

> The defendant proceeds to trial with his or her chosen attorney, and the attorney is forced to limit the scope of his or her efforts due to the defendant's financial constraints. The defendant is convicted based on overwhelming evidence of his or her guilt.

*Stein*, 541 F.3d at 158 n.15. The present case doesn't even reach that level. Although there was powerful evidence of guilt, Krogmann's attorney admitted that, except for the jury consultant, the asset freeze did "not seem to affect what [he] was doing."

And even at that, "S*tein* tested the outer limits of the Sixth Amendment's protection." *United States v. Fattah*, 858 F.3d 801, 809 (3d Cir. 2017); *see also United States v. Fisher*, 273 F. Supp. 3d 354, 363 n.6 (W.D.N.Y. 2017) ("Fisher argues that the alleged Sixth Amendment violation in this case is structural error. But Fisher does not show why a claim for *interference* with counsel—rather than *denial* of counsel—should be subject to the harsh remedy of structural error." (Citation omitted.)).

The majority quotes *United States v. Rosen*, 487 F. Supp. 2d 721, 727 n.8 (E.D. Va. 2007), for the proposition that "the right to expend one's resources in one's own defense" is "a Sixth Amendment right

independent of the right to counsel of choice and to effective counsel." Yet the majority omits the point that really matters about *Rosen*: The court found that the right was *not* subject to a structural error analysis. *Id.* at 735–36. Accordingly, notwithstanding undisputed government interference with fee advances, the district court denied the defendants' Sixth Amendment claim in *Rosen* "for lack of a showing of prejudice." *Id.* at 736.

In effect, the majority conjures a new fundamental, structural right to be free from impediments on spending money that neither the Federal nor the Iowa Constitution recognize. The cases cited by the majority for this supposed "right" involve only the designation of *who* would represent the defendant—i.e., either a chosen counsel or the defendant himself or herself, *see United States v. Gonzalez-Lopez*, 548 U.S. 140, 126 S. Ct. 2557 (2006) (right to counsel of choice); *McKaskle v. Wiggins*, 465 U.S. 168, 104 S. Ct. 944 (1984) (right to self-representation); *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525 (1975) (right to self-representation), or a refusal to honor the defendant's *objectives. See McCoy v. Louisiana*, ___ U.S. ___, 138 S. Ct. 1500 (2018). Neither of those matters is at issue here.[15]

---

[15]The majority's discussion of the United States Supreme Court's recent decision in *McCoy* shows how far afield the majority is reaching for precedent. *McCoy* held that it was structural error for trial counsel to admit a client's guilt over the client's objection. *Id.* at ___, 136 S. Ct. at 1512. The Court noted that the Sixth Amendment provides a right to the "assistance" of counsel. *Id.* at ___, 136 S. Ct. at 1508. This means the client reserves the ultimate right to determine certain defense objectives, including whether or not to maintain innocence of the charged criminal acts. *Id.* at ___, 136 S. Ct. at 1508–09.

Nothing like that right is involved here. The majority seizes on the Supreme Court's use of the word "autonomy" and argues that this case also involves "autonomy" rights. But that is only true at a very high level of generality, at a level where almost *any* constitutional error deprives the defendant of "autonomy." (Indeed, most of the Bill of Rights has to do with autonomy.) For example, if the defendant is wrongfully denied the opportunity to call a defense witness, or cross-examine a witness for the State, to

The majority disregards our own precedent on structural error. In *Lado v. State*, we discussed the concept at some length. 804 N.W.2d 248, 252 (Iowa 2011). We said that "our case law provides few applications of structural error." *Id.* n.1. Structural error occurs only when "the criminal adversary process itself is 'presumptively unreliable.'" *Id.* at 252 (quoting *United States v. Cronic*, 466 U.S. 648, 659, 104 S. Ct. 2039, 2047 (1984)). Structural error exists where the error "affect[s] the framework within which the trial proceeds." *Id.* (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 1265 (1991).

> We have recognized structural error occurs when: (1) counsel is completely denied, actually or constructively, at a crucial stage of the proceeding; (2) where counsel does not place the prosecution's case against meaningful adversarial testing; or (3) where surrounding circumstances justify a presumption of ineffectiveness, such as where counsel has an actual conflict of interest in jointly representing multiple defendants.

*Id.*

None of these scenarios arose here. In fact, as the court of appeals pointed out, "[t]he record reveals that Krogmann hired not one but three attorneys of his own choosing—one in the pretrial phase, a second in the pretrial and trial phases, and a third for his direct appeal." *See also State v. Mulatillo*, 907 N.W.2d 511, 518 (Iowa 2018) ("The defendant is deprived of his or her right to counsel when the court erroneously prevents the defendant from being represented by his or her counsel of choice, and no further inquiry into ineffectiveness of counsel or prejudice is required to establish a violation of the defendant's right to counsel.").

---

some extent the defendant is no longer "master of the defense." Yet we would not say those errors are structural.

I would affirm the decisions of the district court and the court of appeals denying Krogmann's application for postconviction relief.[16]

Waterman, J., joins this dissent.

---

[16]I agree with the majority's resolution of the consecutive-sentences issue.