# IN THE COURT OF APPEALS OF IOWA

No. 24-0107
Filed July 23, 2025

**JEROD KURT MILLER,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Wright County, Blake H. Norman,

Judge.


An applicant appeals the denial of his application for postconviction relief.

**AFFIRMED.**


Robert A. Nading II of Nading Law Firm, Ankeny, for appellant.

Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney

General, for appellee State.


Considered without oral argument by Schumacher, P.J., and Badding and

Chicchelly, JJ.

**BADDING, Judge.**

At Jerod Miller's trial for willful injury causing serious injury and domestic abuse assault by strangulation causing bodily injury, the prosecutor's opening statement told the jury that Miller left his girlfriend, H.S., "[b]eaten, broken, and bruised" after a brutal assault in February 2018. The jury rejected Miller's claim that he acted in self-defense and found him guilty as charged.[1]

Miller applied for postconviction relief, raising a different theory about how H.S. was injured—that she was intoxicated and fell down the stairs the night before the assault. Miller claimed the prosecutor committed misconduct because he argued "that all of [H.S.]'s injuries . . . occurred in the altercation with Jerod Miller." He also claimed defense counsel was ineffective for failing to present the alternative falling-down-the-stairs theory to the jury. The district court denied these claims and dismissed Miller's application. We affirm on Miller's appeal from that ruling.

## I.    Criminal Proceedings[2]

Jerod Miller and H.S. were high school friends who reconnected when they were in their late thirties. Miller moved into H.S.'s house in November 2017. By early February 2018, their relationship had become volatile. H.S. recorded Miller on a vicious rant, during which he repeatedly called H.S. "worthless" and a "nasty

---

[1] We affirmed Miller's convictions on direct appeal. *See State v. Miller*, No. 18-1839, 2020 WL 1307697, at *1 (Iowa Ct. App. Mar. 18, 2020).

[2] Miller's first jury trial in July 2018 ended in a mistrial. He was retried the next month. Although Miller's appellate brief refers to some testimony from his first trial, we have only considered the evidence presented at his second trial.

fucking bitch." He also told H.S. that she deserved to "get knocked out" and that if she was "a dude," he would have killed her and covered it up.

H.S. testified that several weeks later, on February 24, she woke up to Miller screaming at her to give him a ride somewhere. Miller came into H.S.'s bedroom, "wanting to know where a gun was." She told him that it was in her dresser, which he knocked over. H.S. got out of the bedroom and walked down the hallway towards the kitchen. Miller followed her, bent her backwards over the kitchen counter, and shoved his thumbs into her eye sockets until she passed out. The next thing that H.S. remembered was waking up in the hallway, surrounded by broken glass. She had trouble standing and was very confused. H.S. made it back into her bedroom and passed out on her bed.

When H.S. regained consciousness several hours later, she called her mother for help. H.S. thought that Miller was still in the house, possibly in the basement, because all their vehicles were there. Because H.S. "didn't want to make him mad again," she told her mother that she "had fallen down the stairs and not to be alarmed but just to come out and get me." H.S.'s mother, Candis, was shocked by what she saw when she got to the house:

> [T]here was glass and debris all over the floor leading in, through the kitchen, down the hallway, and [H.S] was back in the bedroom trying to talk. I really couldn't understand her. . . . I was just really shocked, and I was trying to decide what to do. I wanted to call 911, but it was obvious what had happened and I didn't know where [Miller] was.

A video of H.S.'s home that was taken by law enforcement after the assault showed a path of destruction. There were blood smears in the hallway, indentations in a door, cracked drywall on the ceiling of the bedroom, a broken window in the bedroom, broken televisions and lamps, and a bullet hole in the hallway across

from the bedroom. Scared that Miller was hiding somewhere, waiting to "finish the job," Candis helped H.S. to her car and drove her to the emergency room.

H.S.'s treating physician, Dr. Subhash Sahai, testified that H.S. was in serious condition when he evaluated her that evening. Both of H.S.'s eyes were swollen shut, her left eye was hemorrhaged, and she "had bruises all over her body, including the face." Dr. Sahai also saw "a line form bruise" on H.S.'s upper chest that he thought was from a shoe. And she had linear marks on her neck and throat that Dr. Sahai said were consistent with strangulation. According to Dr. Sahai, it was "easier to describe where she didn't have the bruises." An MRI showed that H.S. also "had multiple small hemorrhages in the brain," along with a ligament tear to her lower lumbar area. Dr. Sahai testified that these injuries, including the bleeding on H.S.'s brain, created a substantial risk of death. He admitted her to the hospital, where she stayed for the next six days.

Hospital staff contacted law enforcement to report the assault. Due to H.S.'s injuries, Deputy Anthony Pieczko was unable to interview her until February 26. After speaking to H.S., and taking photographs of her injuries, Deputy Pieczko went to her residence with two other deputies, where they found Miller asleep in the basement with a handgun underneath his pillow. Deputy Pieczko arrested Miller, who told him in a recorded interview that H.S. had taken "the butt of her fucking gun and whacked me across the fucking face." When the deputy asked how he responded, Miller said, "I'm sure a fucking—a fight broke out." According to Miller, H.S. had a drinking problem and when she drinks too

much whiskey, "she fucking flips."[3]  He told the deputy that after he got the gun away from H.S. "through force," he walked downstairs and fell asleep.  At the jail, Miller told another deputy that although he didn't remember exactly what happened after H.S. hit him, he did "whatever it took to get the gun out of her hands."  Deputy Pieczko testified that Miller did not have any visible injuries to his head when he was arrested.  But a video from Miller's holding cell after his arrest appeared to show Miller hit his head against the concrete wall and stagger backwards.  A doctor examined Miller on February 27 and diagnosed him with a mild concussion.

After the State rested its case, Miller testified in his own defense.  He mostly stuck to the same story that he told the deputies when he was arrested—although Miller added that when H.S. hit him with the butt of the gun, it discharged.  Miller said the next thing he remembered was standing over H.S. in the bathroom, yelling for the gun.  He found it under the dresser in the bedroom and went down to the basement.  When asked why he didn't tell law enforcement about the gun firing, Miller said that he didn't want to get H.S. in trouble.  On cross-examination, Miller agreed there had been an altercation between him and H.S. on February 24.  He also agreed that H.S. had serious injuries that created a substantial risk of death.  But he maintained that he had "no idea" what caused those injuries.

The prosecutor asserted in his closing argument that the "nature and the extent and severity" of H.S.'s injuries showed that Miller did not act in self-defense.  Defense counsel did not dispute those injuries in his closing argument.  Instead,

---

[3] H.S.'s toxicology screen from the hospital was positive for marijuana and methamphetamine but negative for alcohol.  H.S. admitted that she smoked marijuana the night before the assault, but she denied ever using methamphetamine.

counsel argued the "issue for the case is intent" and asserted the bullet hole in the hallway wall and Miller's concussion supported his testimony that he acted in self-defense. The jury did not buy that argument and found Miller guilty of willful injury causing serious injury and domestic abuse assault by strangulation causing bodily injury. The district court denied Miller's post-trial motions, which were focused on the sufficiency and weight of the evidence, and sentenced him to prison.

## II. Postconviction Relief Proceedings

Miller applied for postconviction relief in February 2021, claiming the prosecutor engaged in misconduct that denied Miller due process of law and that defense counsel was ineffective. Because of the prosecutorial misconduct claim, Miller moved to have the prosecutor who tried the criminal case removed from the postconviction relief proceedings. The district court granted that motion.[4] Before a new attorney entered an appearance for the State, Miller served requests for admissions on the recused prosecutor. One of the requests in support of his prosecutorial misconduct claim asserted the prosecutor "knew or should have known that H.S. had reported her head and face had been injured before her altercation with [Miller] on February 24, 2018." Another asserted that Miller "received ineffective assistance of counsel for many different reasons," including failing to offer "inconsistent statements of H.S." about "the time and manner of her injuries, and that she had sustained injuries to her face and head before the altercation" with Miller.

---

[4] We take no position on the propriety of the motion to remove the prosecutor or the court's ruling granting that motion.

When the requests went unanswered, Miller moved for summary disposition, arguing the State "has admitted every element of the Applicant's case." *See* Iowa R. Civ. P. 1.510(2) (deeming the matter admitted unless the responding party answers or objects to the requests). After a hearing on Miller's motion, the district court ruled that although the requests would be deemed admitted, whether Miller received ineffective assistance of counsel "still remains for the Court to ultimately decide." Finding genuine issues of material fact on that claim, as well as the prosecutorial misconduct claim, the court denied Miller's summary disposition motion.[5]

The case proceeded to a two-day evidentiary hearing in December 2022, at which H.S.'s medical records from the assault were admitted into evidence. Notes from a nurse practitioner who examined H.S. on February 24, 2018, described the "history of present illness" as:

> The patient presents with fall down the steps and possible assault. . . . [H.S.] states that she fell down the steps last night around 2200. States that she was able to get into her bed. Per her mother, she was unable [to] get ahold of her, and went to her house to find her laying at the bottom of the stairs.

Miller argued this medical record contradicted testimony from H.S. and her mother at his criminal trial about the cause of H.S.'s injuries. He also highlighted notes from the nurse practitioner's physical examination, which stated, "There are numerous ecchymotic areas *of different stages of healing* on the face, chest, neck,

---

[5] On appeal, Miller challenges portions of the district court's summary disposition ruling. We have not considered those arguments because an "order overruling a motion for summary judgment is a nonreviewable order when the district court finds a genuine issue of material fact exists and the case proceeds to final trial." *Estes v. Progressive Classic Ins.*, 809 N.W.2d 111, 114 (Iowa 2012).

arms, legs, chest, abdomen, back." (Emphasis added.) But the same notes also observed what "appears to be a shoe print on the left lateral abdomen, and finger marks on the anterior neck." And a note from Dr. Sahai the day after the assault stated, "She refuses to admit but it is pretty obvious from the corroborative evidence that she was beaten probably by her boyfriend. . . . She was beaten once before and at that time she refused to press any charges."

Miller also offered a recording of Deputy Pieczko's interview with H.S. on February 26 into evidence, during which she said that she "got hurt the night before" the assault and "like my face and everything it was already hurt." But H.S. also said, "I forget. I am kind of weird on the last few days. I am not all one hundred percent," and the "injuries I have right here stem from him." Finally, Miller offered a video of H.S.'s house into evidence that showed the steps down to the basement, which had a concrete floor. An emergency room physician retained by Miller as an expert witness testified that H.S.'s injuries "could have been caused by a fall or assault or both." But he was asked to assume the steps to the basement were wooden, and H.S. testified at the postconviction relief hearing the steps were carpeted. The expert also examined the photographs of H.S.'s injuries and opined,

> Because of the coloration of the bruising on her face, chin, eyes, and behind the ears, it is more likely those injuries or bruising were a result of an injury to her head that occurred at least twelve or more hours before she was examined in the [emergency room] at approximately 5 p.m. on February 24, 2018.

The photographs the expert examined, however, were taken by Deputy Pieczko when he interviewed H.S. at the hospital on February 26.

H.S. testified at the postconviction relief hearing that she did not fall down the basement steps the night before the assault. She explained that she was "[j]ust

trying to get in" to the hospital and "get safe" when she made those statements. H.S. testified that all her injuries were caused by Miller. During his testimony at the hearing, Miller agreed that H.S. did not have any of the injuries shown in Deputy Pieczko's photographs when he saw her the morning of February 24.

Miller's trial counsel testified that he "was aware from almost the beginning of the case that [H.S.] had originally claimed she had fallen down the stairs." But, hemmed in by Miller's statements to the deputies after his arrest and the nature of H.S.'s injuries, counsel believed claiming self-defense "was a much stronger defense than if she fell down the stairs." He testified, "I don't believe that the jury would have considered that argument for a heartbeat." Counsel explained "it was to our benefit" to argue that H.S.'s injuries happened after the altercation with Miller because it supported the self-defense claim and did not open the door to evidence of prior assaults between the parties.[6]

After hearing this evidence and reviewing the underlying criminal file, the district court denied Miller's application for postconviction relief. The court first found it was not bound by the State's defaulted admission that defense counsel was ineffective. The court then rejected each of Miller's claims on the merits, finding there was no prosecutorial misconduct and concluding defense counsel

> presented a reasonable and capable defense on Miller's behalf. Essentially, all of the grounds and issues raised go toward the fact that Miller believes the wrong trial strategy was used and a reasonable attorney's trial strategy of challenging the injury element along with attacking the victim's testimony and credibility should have been employed. Further, the theory of this relief action was to

---

[6] Miller was charged with domestic abuse assault of H.S. in January 2018. H.S. later stated in an affidavit to cancel the no-contact order that Miller "has never assaulted me." That charge was still pending when Miller went to trial for the February assault.

raise as many possible mistakes, no matter how minor, with the hope that cumulatively it would be found that [trial counsel] committed a breach of duty and prejudice resulted. Even with the benefit of hindsight and a thorough review of the record, there is nothing in the record presented to the Court that shows [trial counsel] should have acted substantively different. . . .

Miller appeals.

## III. Standard of Review

Postconviction-relief proceedings are normally reviewed for correction of errors at law. *See* Iowa R. App. P. 6.907; *Krogmann v. State*, 914 N.W.2d 293, 306 (Iowa 2018). But when the application raises a constitutional claim, such as ineffective assistance of counsel, we review the proceedings de novo. *Sothman v. State*, 967 N.W.2d 512, 522 (Iowa 2021).

## IV. Analysis

### A. Requests for Admissions

We start with the preliminary matter of the unanswered requests for admissions. Miller claims the district court erred "by holding that the admission by the State that Miller had ineffective assistance of counsel was not binding on the court." We disagree. As the State points out, our supreme court has held that default procedures authorized in our rules of civil procedure "are inconsistent with and would serve no useful purpose in our postconviction review process." *Furgison v. State*, 217 N.W.2d 613, 618 (Iowa 1974) (denying applicant's request for a default judgment against the State for its failure to timely answer the postconviction relief application). "Even if the State never filed an answer to an application for postconviction relief, the court would still address the case on the merits." *Ciric v. State*, No. 15-1860, 2017 WL 936087, at *2 (Iowa Ct. App.

Mar. 8, 2017); *see also Thomas v. State*, 220 N.W.2d 874, 877 (Iowa 1974) (observing postconviction relief "is not akin to a private suit on a note in which the plaintiff is entitled to his judgment if the defendant defaults").

While all "rules and statutes applicable in civil proceedings including pretrial and discovery procedures are available to the parties" in postconviction relief proceedings, Iowa Code § 822.7 (2021), "a collateral review of criminal judgments should be tailored to the purpose thereof without characterization as criminal or civil.  It must encompass some attributes of each where appropriate to the objective, at the same time eliminating those inappropriate to the remedial process." *Furgison*, 217 N.W.2d at 617.  The intent of postconviction relief is to "get at the *merits* of the controversy."  *Thomas*, 220 N.W.2d at 877 (emphasis added).  Allowing the State to default on discovery requests and admit the ultimate issues would "breathe life into an otherwise meritless application"—which is exactly what *Furgison* warns us not to do.  217 N.W.2d at 618.

Because postconviction relief proceedings must be decided on their merits—not on defaults by the State—we conclude that the district court properly determined it was not bound by the default admissions.

### B. Prosecutorial Misconduct

Miller claims the prosecutor committed misconduct by arguing that "H.S. received all of her injuries the morning of February 24, 2018, during a beating inflicted by Miller, then causing all her injuries."  "[T]o prevail on a claim of prosecutorial misconduct, the defendant must show both the misconduct and resulting prejudice."  *State v. Krogmann*, 804 N.W.2d 518, 526 (Iowa 2011).  Miller's appellate brief focuses exclusively on arguments about the alleged

misconduct. While he recites the factors considered in determining prejudice, *see id.*, Miller does not advance any argument about how those factors apply here. *See Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) ("In a case of this complexity, we will not speculate on the arguments [a party] might have made and then search for legal authority and comb the record for facts to support such arguments."). In any event, we agree with the State that Miller "failed to prove that the prosecutor committed misconduct by knowingly presenting false testimony." *See Jones v. State*, 479 N.W.2d 265, 275 (Iowa 1991) (setting out the elements of a prosecutorial misconduct claim based on presentation of false testimony).

Miller's prosecutorial misconduct claim assumes that H.S.'s testimony at his criminal trial was false because of statements she made in the aftermath of the assault about falling down the stairs. *See id.* (finding a similar "assumption falls far short of the affirmative proof required to merit a new trial"). But H.S. never recanted her trial testimony that her injuries were from Miller, not from falling down the stairs. The prosecutor testified that "it's certainly not uncommon for victims of domestic abuse to claim that the cause of their injuries was something other than the person who has abused them." Because of the nature and extent of H.S.'s injuries—including the strangulation-type bruises around her neck and the shoe-shaped bruise on her chest—he was skeptical of H.S.'s initial claims at the hospital that she fell down the stairs. H.S.'s medical providers were also skeptical, indicating throughout their treatment notes that her injuries were from a "possible assault." And while H.S. made some inconsistent statements about when her injuries occurred, the prosecutor testified that as H.S. recovered, her memory about the date of the assault became clearer. We accordingly agree with the

district court that there was "no false evidence presented or denial of a fair trial" and affirm its denial of Miller's prosecutorial misconduct claim.

### C.      Ineffective Assistance of Counsel

To establish his claim of ineffective assistance, Miller must prove that (1) counsel failed to perform an essential duty and (2) prejudice resulted. *State v. Lopez*, 907 N.W.2d 112, 116 (Iowa 2018); *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984). We "may consider either the prejudice prong or breach of duty first, and failure to find either one will preclude relief." *State v. McNeal*, 897 N.W.2d 697, 703 (Iowa 2017) (citation omitted). Miller's claim fails on the prejudice prong.

To prove "constitutional prejudice," Miller was required to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Smith v. State*, 7 N.W.3d 723, 727 (Iowa 2024) (quoting *Strickland*, 466 U.S. at 694). Miller's appellate brief does not address that standard, arguing only that he was "clearly prejudiced" by counsel's alleged errors. Such "'conclusory claims of prejudice' are not sufficient to satisfy the prejudice element." *State v. Tate*, 710 N.W.2d 237, 241 (Iowa 2006) (citation omitted).

Miller's structural-error argument does not save his claim for two reasons. First, "[w]hen a defendant fails to preserve a claim of structural error and instead raises the error in the context of an ineffective-assistance-of-counsel claim," as Miller did here, "the defendant must still establish constitutional prejudice." *Smith*, 7 N.W.3d at 727; *see also Weaver v. Massachusetts*, 582 U.S. 286, 299 (2017) ("[I]n the case of a structural error where there is an objection at trial and the issue

is raised on direct appeal, the defendant generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.'"). Second, Miller was not "essentially without counsel," as he argues on appeal. *See Lado v. State*, 804 N.W.2d 248, 252 (Iowa 2011) (describing three categories of structural error).

The record shows that defense counsel pursued a self-defense claim that acknowledged the physical evidence, Miller's statements to police, and his purported recollection of what happened on February 24, 2018. This is considerably different from *Lado*, where counsel failed to take *any* action at all. 804 N.W.2d at 252–53; *see also Rickey v. State*, No. 16-1212, 2017 WL 2461560, at *3 (Iowa Ct. App. June 7, 2017) ("Unlike *Lado*, in which counsel took no action at all, Rickey was not completely denied counsel, actually or constructively, at any point in the proceeding."). We agree with the district court that

> Miller was never deprived of counsel as any action (or inaction) was related to a reasonable and deliberate trial strategy. [Defense counsel] provided thoughtful responses regarding each of his alleged deficiencies of evidence and argument at trial as well as in his depositions. [Counsel's] decisions were explained in a reasonable, strategy-related manner.

For these reasons, we affirm the court's denial of Miller's ineffective assistance claim.

## V. Conclusion

We conclude the district court was correct in determining that it was not bound by the State's defaulted admissions that defense counsel was ineffective. The court was also correct in finding that Miller failed to prove his prosecutorial

misconduct and ineffective-assistance claims.  We accordingly affirm the court's dismissal of Miller's application for postconviction relief.

**AFFIRMED.**